888 A.2d 624

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Joseph Daniel MILLER, Appellee.**

Supreme Court of Pennsylvania.

Submitted Aug. 20, 2003.

Decided Dec. 27, 2005.

James Patrick Barker, Williamsport, Amy Zapp, Harrisburg, for Com.

Robert Brett Dunham, Philadelphia, PA, for Joseph Daniel Miller.

Mark J. Murphy, for PA Protection & Advocacy.

Before CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN, BAER, JJ.

## *OPINION*

Chief Justice CAPPY.

In this case, we are asked to consider the impact of the recent United States Supreme Court case of *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), on our collateral capital jurisprudence. Appellee, Joseph Daniel Miller, filed a petition under the Post Conviction Relief Act (hereinafter "PCRA"), 42 Pa.C.S. §§ 9541–9546, seeking relief under *Atkins*. Following a review of the trial court record and the record of the first PCRA proceedings, the PCRA court vacated Appellee's sentences of death and imposed consecutive sentences of life in prison. For the reasons stated herein, we vacate the order of the PCRA court and remand this matter for further proceedings consistent with our decision today.

On March 24, 1993, a jury convicted Appellee of first degree murder and kidnapping for the killing and abduction of Selina Franklin and first degree murder for the killing of Stephanie McDuffey. Following a sentencing hearing, the jury found that the aggravating circumstances outweighed the mitigating circumstances and imposed a sentence of death.[1] The trial court denied post-sentence motions, and this court affirmed the sentences of death. *Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310 (1995).

On December 13, 1995, the Governor signed a warrant of execution and thereafter, this court granted a stay of execution. Subsequently, the United States Supreme Court denied Appellee's petition for writ of certiorari. *Miller v. Pennsylvania*, 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996). On March 11, 1996, the Governor signed another warrant of execution, which this court stayed. We then appointed counsel to allow Appellee to pursue collateral relief under the PCRA, which the PCRA court denied. This court affirmed the PCRA court's order on appeal. *Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592 (2000).

On June 20, 2002, the United States Supreme Court filed its opinion in *Atkins*, declaring that executions of mentally retarded criminals violated the Eighth Amendment prohibition of cruel and unusual punishment.[2] On August 19, 2002,

1. The jury found two aggravating circumstances for each victim which outweighed the six mitigating circumstances. For Selina Franklin, the jury found that Appellee had committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), and that Appellee had a significant history of felony convictions, 42 Pa.C.S. § 9711(d)(9). For Stephanie McDuffey, in addition to the significant history circumstance, the jury found that Appellee had been convicted of another murder committed before or at the time of the offense at issue (the murder of Selina Franklin), 42 Pa.C.S. § 9711(d)(11). The six mitigating circumstances that the jury found applicable to both murders were that Appellee: was the victim of child abuse; had been neglected by his family and society; suffered from psychological trauma caused by neglect; had a low mental intelligence; suffered from mental illness; and had alcohol abuse problems, 42 Pa.C.S. § 9711(e)(8). *Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310, 1314 nn. 5 & 6 (1995).

2. As the *Atkins* Court explained, "the Eighth Amendment succinctly prohibits '[e]xcessive' sanctions. It provides: 'Excessive bail shall not

Appellee filed a second petition seeking PCRA relief under *Atkins.* Following a review of the documentary evidence that was submitted by both parties, the PCRA court granted relief under *Atkins.* The PCRA court reasoned that a PCRA court may grant relief without a hearing when the petition and answer show that there is no genuine issue concerning any material fact and that the petitioner is entitled to relief as a matter of law. PCRA court opinion at 6 (citing Pa.R.Crim.P. 907(2)). The court first acknowledged that *Atkins* left it to the individual states to decide on the standards and procedure that a court should use in adjudicating the mental status of a defendant. Thus, it recognized that it needed to develop such standards and procedures in order to resolve Appellee's claim. Consistent with this, the PCRA court held that the burden of proof in such cases was on the petitioner to establish his mental retardation by a preponderance of the evidence and that such evidence must be presented to the court and not a jury.[3] It then went on to define "mental retardation" by relying on the definitions of that term as set forth by the American Psychiatric Association in the Diagnostic and Statistical Manual of Mental Disorders (4th ed.1992) (hereinafter "DSM–IV") and the American Association of Mental Retardation (hereinafter "AAMR") in MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (10th ed.2002) (hereinafter "MENTAL RETARDATION"). Each of these definitions, the court concluded, required the demonstration of "three core components: (1) substantial intellectual impairment; (2) impact of that impairment on the everyday life of the individual (i.e., substantial deficits in adaptive functioning); and (3) appearance of the disability prior to age 18." PCRA court opinion at 15.

The PCRA court then examined Petitioner's school records, psychological reports, and expert testimony from the prior

be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' " *Atkins,* 536 U.S. at 311, 122 S.Ct. 2242.

3. We need not reach the question of whether a mental retardation claim is to be resolved by a judge or jury at trial, since the case before us involves the proper procedure for resolution of an *Atkins* claim on collateral review.

proceedings, acknowledging that none of the prior proceedings specifically litigated the question of mental retardation. The court, however, was persuaded that this evidence established Petitioner's mental retardation. Specifically, the evidence relied upon by the PCRA court included the facts that: Appellee was placed in special education classes beginning in first grade for the "educable" mentally retarded; during his early years, his IQ was repeatedly tested and he tested in the 50's and 60's; in his early teens, he twice tested in the high 70s and low–80's [4]; and in 1986, at 21 years of age, he was measured with an IQ of 71 and was described as functioning within the "borderline retarded range of intelligence." PCRA court opinion at 17. In addition to the documentary evidence, all five mental health experts who testified during the penalty phase and at the first PCRA hearing, including the Commonwealth's expert at the PCRA hearing, agreed that Appellee was borderline retarded or mentally retarded. Accordingly, the court concluded that Appellee proved by a preponderance of the evidence that he is mentally retarded.

It is from this decision that the Commonwealth appeals. 42 Pa.C.S. § 9546(d). The Commonwealth requests that this court vacate the PCRA court's order and remand this matter for further proceedings, including an examination of Appellee by Commonwealth experts and an evidentiary hearing. In support of its position, the Commonwealth first argues that the Court's decision in *Atkins* constituted exceptional circumstances, which justify discovery in this PCRA proceeding. *See* Pa.R.Crim.P. 902(E)(1). The Commonwealth points out that there has never been an examination of Appellee to determine, for purposes of the Eighth Amendment prohibition, whether he is mentally retarded, and the Commonwealth contends that it is a matter of fundamental fairness to allow it the opportunity to conduct such an examination. The Commonwealth also disputes the PCRA court's reliance on the "practice effect" in the absence of being able to conduct its own examination of

---

4. The court ultimately attributed these higher scores to the "practice effect" described by Appellee's experts. The "practice effect" simply refers to the concept that over time performance on an IQ test may improve with practice. N.T., PCRA Hearing, 9/27/1997, at 48.

Appellee. *See supra* n. 4. Likewise, the Commonwealth argues that it was entitled to an evidentiary hearing on this issue since the Commonwealth disputed Appellee's claim that he was mentally retarded in its answer to Appellee's petition. Lastly, the Commonwealth faults the PCRA court for failing to define mental retardation, and argues that absent such a definition, it was impossible for the court to make a determination of whether Appellee was mentally retarded.

Appellee responds that the fact of his mental retardation was never challenged at the prior proceedings and principles of res judicata and collateral estoppel should bar the relitigation of this issue. In fact, the Commonwealth's expert accepted the fact that Appellee was mentally retarded in order to defeat the mental health claim that Appellee raised at the first PCRA hearing. Furthermore, he maintains that the prior documentary and testamentary evidence was sufficient to establish his mental retardation and the jury agreed with that evidence, since it found his low intelligence to be a mitigating factor. Thus, Appellee concludes that the Commonwealth should not be allowed to perform further testing on him.

Appellee acknowledges that this case presents an issue of first impression as to how *Atkins* should be implemented in this Commonwealth and points out that *Atkins* categorically bans capital sentencing and execution of persons with mental retardation. At a minimum, Appellee contends that the states must adopt the definition provided by the AAMR or the American Psychiatric Association as these were the definitions used in *Atkins*. But, Appellee argues that states are free to adopt a more inclusive standard, like the definition set forth in Pennsylvania's Mental Health and Mental Retardation Act, 50 P.S. § 4102, and Appellee urges this court to adopt this definition in applying *Atkins*. Ultimately, however, Appellee contends that this court need not resolve the question of the proper standard for assessing mental retardation since Appellee is mentally retarded under any constitutionally acceptable definition of mental retardation.

 The logical starting point for any discussion is a brief review of the *Atkins* decision. *Atkins,* in the broadest sense, holds that the Eighth Amendment bars the execution of the mentally retarded. In reaching this conclusion, the Court pointed out that it is a "precept of justice that punishment for a crime should be graduated and proportioned to [the] offense." *Atkins,* 536 U.S. at 311, 122 S.Ct. 2242. In adjudicating a claim that punishment is excessive (and therefore, not proportional), the Court must consider the "evolving standards of decency that mark the progress of a maturing society." *Id.* at 311–12, 122 S.Ct. 2242. In light of the fact that there appeared to be a consistent national consensus opposed to the execution of the mentally retarded, the Court believed that it was time to revisit its prior decision in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), which held that the Eighth Amendment did not prohibit the execution of the mentally retarded. *Id.* at 314–16, 122 S.Ct. 2242.

In addition to the changing national consensus, the Court considered the diminished personal culpability of the mentally retarded offender. *Id.* at 318, 122 S.Ct. 2242. Although mentally retarded individuals are capable of differentiating between right and wrong, due to their subaverage intelligence and limited adaptive skills, they often fail to learn from their experiences or learn to control their impulses. *Id.* Thus, when looking at the deficiencies of the mentally retarded person in conjunction with the stated purposes of capital punishment—retribution and deterrence—the Court concluded that mentally retarded individuals should be excluded from execution categorically. *Id.* at 319, 122 S.Ct. 2242. The concept of retribution, i.e., seeing that the criminal suffers his "just desserts," will not be served by executing the mentally retarded, because mentally retarded persons as a class possess diminished personal culpability for their actions. *Id.* Likewise, deterrence is not an effective method of interaction with a mentally retarded person, as they are not capable of the level of impulse control that is required to calculate the risk attendant to the decision to take a life. *Id.* at 320, 122 S.Ct. 2242. Accordingly, the Court concluded that the Eighth

Amendment "places a substantive restriction on the State's power to take the life" of a mentally retarded offender. *Id.* at 321, 122 S.Ct. 2242 (*quoting Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). Consistent with its decision in *Ford,* the Court left the determination of how to apply the ban on the execution of mentally retarded defendants convicted of capital crimes to the individual states. *Id.* at 317, 122 S.Ct. 2242.

 It is from this point that our decision today proceeds. Having reviewed the parties' arguments and the Court's decision in *Atkins,* we now turn to the question of what is the proper procedure for a PCRA court to follow when confronted with an *Atkins* claim.[5] Resolution of that question will necessarily encompass the definition that the reviewing

5. Neither party challenges the jurisdiction of this court to entertain the instant petition on the basis of timeliness. The question of a court's jurisdiction, however, is not waivable. The PCRA provides an exception to the one year jurisdictional time limit when "the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively." 42 Pa.C.S. § 9545(b)(1)(iii). Such an exception must be invoked within 60 days of the date the claim could have been presented. 42 Pa.C.S. § 9545(b)(2).

In *Penry,* the case which *Atkins* overruled, the Court explained retroactivity in the context of a rule prohibiting a category of punishment to a certain class of defendants, concluding that:

[T]he first exception set forth in *Teague [v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)] should be understood to cover not only rules forbidding criminal punishment of certain primary conduct **but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense.** Thus, if we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry regardless of the procedures followed, **such a rule would fall under the first exception to the general rule of nonretroactivity and would be applicable to defendants on collateral review.**

*Penry,* 492 U.S. at 330 [109 S.Ct. 2934] (emphasis added). In this case, *Atkins* announced a new rule of law prohibiting a certain category of punishment for a class of defendants because of their status and consistent with *Penry,* such a rule would fall under an exception to the general rule of nonretroactivity. Further, Appellee filed his petition within 60 days of the Court's decision in *Atkins.* Accordingly, Appellee's petition was timely filed and jurisdiction is proper before this court.

court should employ in determining whether a petitioner is mentally retarded and the applicable burden of proof. Furthermore, as we are reviewing a determination of the PCRA court, our review is limited to whether the findings of the PCRA court are supported by the record and are free from legal error. *Commonwealth v. Jones*, 583 Pa. 130, 876 A.2d 380, 384 (2005) (collecting cases). In order to be eligible for relief, a PCRA petitioner must establish by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated defects found in 42 Pa.C.S. § 9543(a)(2). *Id.* Moreover, as the Commonwealth is challenging the PCRA court's determination that a hearing was not necessary in this case, our standard of review regarding that claim is an abuse of discretion. *Id.* at 387.

Like the PCRA court, our analysis of this issue must begin with the proper definition of "mental retardation" for purposes of the application of *Atkins* in Pennsylvania. The United States Supreme Court cited two different definitions of "mental retardation" in *Atkins,* and we will first consider these definitions. The AAMR defines mental retardation as a "disability characterized by significant limitations both in intellectual functioning and in adapative behavior as expressed in the conceptual, social, and practical adaptive skills." MENTAL RETARDATION at 1. The American Psychiatric Association defines mental retardation as "significantly subaverage intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." DSM–IV at 37. Thus, as noted by the PCRA court, both definitions of mental retardation incorporate three concepts: 1) limited intellectual functioning; 2) significant adaptive limitations; and 3) age of onset.[6]

6. The primary distinction between these two classification systems is that the DSM–IV specifies levels of severity of mental retardation, whereas the AAMR classification system no longer specifies levels of severity, but instead, recognizes that a diagnosis of mental retardation relies on both limitations in IQ and adaptive skills and focuses on the levels of support needed following an individual diagnosis. *See* DSM–IV at 45; AAMR at 26.

Further elucidation of two of these concepts is necessary for defining mental retardation in Pennsylvania.[7] Limited or subaverage intellectual capability is best represented by IQ scores, which are approximately two standard deviations (or 30 points) below the mean (100). MENTAL RETARDATION at 14; DSM–IV at 39. The concept should also take into consideration the standard error of measurement (hereinafter "SEM") for the specific assessment instruments used. MENTAL RETARDATION at 57. The SEM has been estimated to be three to five points for well-standardized measures of general intellectual functioning. MENTAL RETARDATION at 57; DSM–IV at 39. Thus, for example, a subaverage intellectual capability is commonly ascribed to those who test below 65–75 on the Wechsler scales. MENTAL RETARDATION at 58; DSM–IV at 39.

Limited intellectual functioning, however, is only part of the equation. Both the AAMR's definition and the DSM–IV's definition of mental retardation provide that a low IQ score is not in itself sufficient to classify a person as mentally retarded. MENTAL RETARDATION at 25; DSM–IV at 39–40. Rather, the person must also show significant limitations in adaptive behavior. Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives, and limitations on adaptive behavior are reflected by difficulties adjusting to ordinary demands made in daily life.[8] MENTAL RETARDATION at 73; DSM–IV at 40. The AAMR recommends that such limitations should be established through the use of standardized measures. "On these standardized measures, significant limitations in adaptive behavior are operationally defined as

7. We see no need to explore the concept of age of onset further, since this requirement is self explanatory and both the AAMR and the DSM–IV require that the age of onset be before age 18.

8. The AAMR shows the adaptive skills by table. Examples of such skills are language and money concepts (conceptual); responsibility and the ability to follow rules (social); and meal preparation and money management (practical). MENTAL RETARDATION at 42 Table 3.1. The DSM–IV requires significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. APA at 39.

performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social and practical skills." MENTAL RETARDATION at 14. Again, the AAMR recommends that the SEM's should be taken into consideration in determining whether an individual's behavior meets the definition of a significant limitation.

What is clear from the above is that these two definitions are very similar and diagnosis under either system of classification takes into account like considerations. Therefore, we hold that a PCRA petitioner may establish his or her mental retardation under either classification system and consistent with this holding, assuming proper qualification, an expert presented by either party may testify as to mental retardation under either classification system. Moreover, consistent with both of these classification systems, we do not adopt a cutoff IQ score for determining mental retardation in Pennsylvania, since it is the interaction between limited intellectual functioning and deficiencies in adaptive skills that establish mental retardation.[9] Moreover, contrary to Appellee's assertions, we do not agree that the definition offered in the Pennsylvania Mental Health and Mental Retardation Act is significantly broader than the definitions we adopt today. That definition provides that "Mental Retardation means subaverage general intellectual functioning which originates during the developmental period and is associated with impairment of one or more of the following: (1) maturation, (2) learning; and (3) social adjustment." 50 P.S. § 4102. This definition generally encompasses the considerations provided for by the AAMR and DSM–IV definitions; and to the extent that the definition of the Mental Health and Mental Retardation Act broadens the definition of mental retardation that we

9. For example, the DSM–IV provides that when classifying a person in the "borderline intellectual functioning" range, assessing deficits in adaptive skills may become more important, since "it is possible to diagnose Mental Retardation in individuals with IQ scores between 71 and 75 if they have significant deficits in adaptive behavior that meet the criteria for Mental Retardation." DSM–IV at 45.

adopt today, we merely note that a broader definition may be appropriate when the diagnosis is for something other than penological interests. Lastly, consistent with the fact that we are at the collateral proceedings stage, the PCRA petitioner needs to establish that he or she is entitled to relief by a preponderance of the evidence before the PCRA court. *Jones, supra.*

■ With these considerations in mind, we turn to the case before us. The PCRA court accepted and used the definitions set forth by the AAMR and DSM–IV and we affirm this part of the opinion. Thus, the questions before us today are simply whether the lower court erred in finding that these definitions were met in the instant case based on the existing documentary and testamentary evidence and whether the court abused its discretion in denying the Commonwealth's request for discovery and an evidentiary hearing.

With regard to the first requirement, limited intellectual functioning, the PCRA court reviewed Appellee's extensive school and psychological records, which reflected that Appellee's IQ had been tested repeatedly throughout his formative years. At the age of 6, in 1971, his full scale IQ was recorded at 66; at the age of 9 ½, his full scale IQ was recorded at 67; at the age of 10 ½, his full scale IQ was recorded at 55; and at the age of 12, his full scale IQ was recorded at 59. Then, at the ages of 16 and 16 years and 9 months, his IQ was recorded at 78 and 81, respectively. Finally, in 1986, at the age of 21, his full scale IQ was recorded at 71 and Appellee was found to be functioning within the "borderline retarded range of intelligence." *See* Report of Psychological Evaluation, 5/8/1986. The PCRA court accepted Appellee's experts' testimony that the higher scores at the age of 16 was due to the "practice effect" described at note 3. In addition to the documentary evidence, the PCRA court also reviewed the testamentary evidence from the first two proceedings, during which, the experts routinely opined that Appellee was "borderline retarded" or "mentally retarded." N.T., Sentencing Hearing, 3/25/1993, at 67; N.T., Sentencing Hearing, 3/25/1993, at 139; N.T., First PCRA Hearing, 9/27/1997, at 50; N.T., 9/27/1997,

at 209. After reviewing the available evidence, the PCRA court concluded that "while petitioner's IQ scores varied widely, the evidence provided [sic] this court established by a preponderance of the evidence that his IQ qualifies as between 70 and 75, or below, placing him in the mild mental retardation range." PCRA court opinion at 21.

Turning to the second and third requirements, the PCRA court reasoned that the experts' conclusions that Appellee was mentally retarded "necessarily include findings, not only of lowered IQ, but also deficits in adaptive functioning and early onset, as those are necessary elements for a clinical diagnosis of mental retardation, whether under the AAMR definition or that included in the DSM, and whether under an earlier or later version of those definitions." PCRA court opinion at 22. While we do not necessarily disagree with the logic employed by the PCRA court, we cannot affirm its findings since, as described more fully below, the prior testimony and evidence proffered at the penalty phase hearing and at the first PCRA hearing were not presented to establish Appellant's mental retardation under *Atkins*.[10]

Specifically, at the first PCRA proceeding, the issue was whether trial counsel was ineffective for failing to present evidence of Appellee's organic brain damage. *Miller*, 746 A.2d at 598–99. To this end, Appellee presented two experts in support of his position that in addition to being mentally retarded, he also was organically brain damaged. In order to counter Appellee's experts' testimony, the Commonwealth presented one expert, Dr. Dixon Miller, a trained psychologist with a subspecialty in clinical neuropsychology. The Commonwealth's position was simply that any evidence of organic brain damage was merely redundant with the diagnosis of

10. For this same reason, we reject Appellee's assertion that the doctrines of collateral estoppel and res judicata preclude relitigation of the *Atkins* claim. Under these doctrines, the particular issue (for purposes of collateral estoppel) or particular matter (for purposes of res judicata) must have been previously litigated. *Commonwealth v. Holder*, 569 Pa. 474, 805 A.2d 499, 502 n. 3 (2002). Yet here, as the PCRA court recognized, Appellee's claim of mental retardation has never before been litigated. Because there was no previous litigation, it is evident that the claim is not being improperly relitigated at this juncture.

borderline or mental retardation. In support of his testimony, Dr. Miller repeatedly stated that Appellee was "functioning at the mentally retarded or borderline retarded range." N.T., 9/27/1997, 209, 217–18; 222; 223–24. The PCRA court relied on this testimony, essentially concluding that the Commonwealth conceded Appellant's mental retardation. PCRA court opinion at 18–19 (noting that the Commonwealth's expert's testimony was "of the greatest significance to this court"). We do not agree.

Dr. Miller's testimony was equivocal on the issue of mental retardation, since he opined that Appellant functioned in the "borderline retarded" or "mentally retarded" range. Yet, there is a critical difference between these two classifications, since if a defendant is classified as having borderline intellectual functioning, he would not automatically be considered "mentally retarded" under *Atkins* unless he also showed significant deficits in adaptive behavior. *See supra* n. 8. Furthermore, at the first PCRA hearing, Appellee's experts' testimony occurred in the context of Appellee's attempt to establish his organic brain damage, rather than mental retardation. Thus, this testimony is of limited value in answering the question before us. Lastly, at the sentencing hearing, Appellee's experts' testimony either classified him as "borderline" or "mildly mentally" retarded. Again, this equivocal testimony does not establish that Appellee was in fact mentally retarded under *Atkins*. Thus, we conclude that the PCRA court abused its discretion by failing to hold an evidentiary hearing when there was no relevant evidence offered to establish mental retardation under *Atkins*. We remand this case for further proceedings consistent with our decision today.

By remanding this matter for further proceedings, we are not discounting the very real possibility that Appellee is ineligible for the death penalty under *Atkins*. We simply cannot agree with the PCRA court's resolution of that issue on the existing record. Upon remand, both parties should be given the opportunity to establish their respective positions under the standard we announce today and thus, we vacate

the order of the PCRA court and remand this matter to the PCRA court for further proceedings.[11]

Justice CASTILLE and NIGRO, Justice NEWMAN and Justice SAYLOR and BAER join the opinion.

Justice EAKIN files a concurring opinion.

Justice EAKIN, concurring.

I concur in the majority opinion, but feel compelled to point out that *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), is no longer a "recent" decision. More than three years have passed since it was announced that each state had to set standards and procedures for adjudicating the mental retardation of a defendant in a capital case. Bills have been introduced, but no legislation has been passed to accomplish this. Meanwhile, cases languish and courts await action which has not been forthcoming.

Accordingly, I concur in the need for this Court to establish the necessary standards so that resolution of these cases may be had without further delay. However, this is inherently a legislative matter—it is hoped that the legislature would also act without further delay.

---

11. While we acknowledge that it would be preferable to have a definition of mental retardation from the Legislature, we have waited nearly three years for such a definition and believe we should not delay announcing a standard under *Atkins* any longer.