925 A.2d 167

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Jerome GIBSON, Appellee.**

**Commonwealth of Pennsylvania, Appellee,**

v.

**Jerome Gibson, Appellant.**

**Commonwealth of Pennsylvania, Appellee,**

v.

**Jerome Gibson, Appellant.**

Supreme Court of Pennsylvania.

Submitted Nov. 22, 2005.

Decided June 26, 2007.

412

Thomas Gary Gambardella, Esq., Amy Zapp, Esq., Bucks County District Attorney's Office, Doylestown, for Commonwealth of Pennsylvania.

Samuel J.B. Angell, Esq., James Milton Anderson, Esq., Helen A. Marino, Esq., Defender Association of Philadelphia, Philadelphia, for Jerome Gibson.

Samuel J.B. Angell, Esq., James Milton Anderson, Esq., Philadelphia, for Jerome Gibson.

Thomas Gary Gambardella, Esq., Amy Zapp, Esq., Bucks County District Attorney's Office, Doylestown, for Commonwealth of Pennsylvania.

Samuel J.B. Angell, Esq., Helen A. Marino, Esq., Defender Association of Philadelphia, Philadelphia, for Jerome Gibson.

BEFORE: CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

*OPINION*

Justice SAYLOR.[1]

Appellant, Jerome Gibson, was convicted of first-degree murder and sentenced to death in 1995, and this Court affirmed the conviction and sentence on direct appeal. *See Commonwealth v. Gibson,* 553 Pa. 648, 720 A.2d 473 (1998). In proceedings under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546 (the "PCRA"), a post-conviction court denied guilt-phase relief but awarded a new penalty hearing, and cross-appeals to this Court ensued. In light of the United States Supreme Court's intervening decision in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that, under the Eighth Amendment to the United States Constitution, the government may not execute a mentally retarded person), the parties sought and obtained a remand to the post-conviction court for a determination as to whether Appellant is mentally retarded. The PCRA court conducted an evidentiary hearing and issued an opinion finding that Appellant is mentally retarded. The court denied Appellant's request for the imposition of a life sentence, however, in light of the limited nature of the remand. Appellant lodged a further appeal, and the matter has been returned to this Court.

Presently, Appellant argues that he is mentally retarded in that he meets the definition under criteria identified by the American Psychiatric Association in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1992) ("DSM–IV"), and by the American Association for Mental Retardation ("AAMR"), *see* AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (10th ed.2002).[2] It is the Commonwealth's position that the evidence presented at the hearing is insufficient to support the conclusion that Appellant is mentally retarded under these criteria.

1. This matter was reassigned to this author.
2. As of January 1, 2007, the AAMR is now known as the American Association on Intellectual and Developmental Disabilities.

■ In Pennsylvania, the prevailing standards governing a determination of mental retardation for purposes of *Atkins* are set forth in *Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624 (2005). A post-conviction petitioner must establish the claim by a preponderance of the evidence, the PCRA judge is the appropriate fact finder, and the standards set forth in the DSM–IV and by the AAMR are appropriate measures. *See id.* at 155–56, 888 A.2d at 631. Those require a petitioner to establish his: 1) limited or subaverage intellectual functioning; 2) significant adaptive limitations; and 3) age of onset as being prior to his eighteenth birthday. *Id.* at 153, 888 A.2d at 630.

■ In terms of intellectual functioning, the primary measure is an Intelligence Quotient ("IQ") of below 65–75 on the Wechsler scales. *Miller*, 585 Pa. at 154, 888 A.2d at 630. It is therefore possible to diagnose mental retardation in individuals with IQ scores between 71 and 75, if they have significant deficits in adaptive behavior. *See id.* at 155 n. 9, 888 A.2d at 631 n. 9; *see also id.* at 155, 888 A.2d at 631 (explaining that "we do not adopt a cutoff IQ score for determining mental retardation in Pennsylvania, since it is the interaction between limited intellectual functioning and deficiencies in adaptive skills that establishes mental retardation"). Adaptive behavior is "the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives, and limitations on adaptive behavior are reflected by difficulties adjusting to ordinary demands made in daily life." *Miller*, 585 Pa. at 154, 888 A.2d at 630 (citing DSM–IV at 45; MENTAL RETARDATION, at 26). Examples of adaptive skills are money concepts and management, responsibility and ability to follow rules, and meal preparation. *See id.* at 154 n. 8, 888 A.2d at 630 n. 8. The DSM–IV requires significant limitations in at least two of the following skill areas: communications, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *See id.*

 In the appellate review of the PCRA court's determination, the standard of review is deferential and is limited to consideration of whether the factual findings are supported by substantial evidence and the legal conclusion is not clearly erroneous. *See Commonwealth v. Crawley*, 592 Pa. 222, 228, 924 A.2d 612, 616 (2007).

 The PCRA court summarized the evidence extensively in its opinion. Briefly, Appellant presented testimony from a medical doctor who studies birth defects, a neuropsychologist, and an educator and learning disabilities specialist, all of who concluded that he is mentally retarded. Several of the witnesses traced Appellant's condition to fetal alcohol syndrome, a debilitating condition resulting from maternal alcohol consumption and characterized by impairments in the development of the brain. The witnesses highlighted that Appellant had been identified as a mentally retarded person in the elementary school system and was always placed in special education classes, with a recorded notation of an IQ score of 67 and his psychological record placing him below the third percentile for academic performance. Multiple adaptive deficits were discussed, including impairments in learning, executive function, problem-solving, memory, intellectual skills, work skills, communications, functional academics, health, safety, self-direction, and attention. The expert testimony indicated that Appellant functions at a second-to-third grade level, demonstrates an inability to manage money, and lacks the capacity to hold a steady job or maintain stable relationships. Various of the deficits, including those in academic skills and self-direction, were described as severe. One expert reported an IQ test score of 81 but indicated that this was not a true score, and it was a consensus of the defense experts that Appellant's IQ was 70 to 75 or below. Appellant also presented testimony from two of his secondary school teachers, who explained that he was properly placed in the special education program, as he could not function in a regular classroom. Finally, Appellant presented affidavits from several other experts that were consistent with the live testimony.

These were admitted into evidence, although the Commonwealth did not agree to their veracity.

The Commonwealth offered testimony from a board-certified forensic psychologist who concluded that Appellant had an IQ of approximately 74 and did not fall within the DSM–IV classification for mental retardation. The Commonwealth's expert conceded, however, that Appellant was severely impaired. He also acknowledged that an IQ test score of between 70 and 75 could indicate mental retardation, depending on the degree of adaptive deficits. It was his opinion, however, that Appellant functions in a borderline range, and his adaptive deficits are not so significant as to implicate mental retardation. Further, the expert explained that school systems in the past had sometimes used relaxed criteria for mental retardation to facilitate the provision of educational services.

The PCRA court did not find a great deal of difference in the testimony of the witnesses, except in terms of their ultimate conclusions. As between Appellant's and the Commonwealth's respective experts, the court noted that the real difference was the significance of the level of Appellant's cognitive abilities and adaptive functioning. Considering the DSM–IV and AAMR standards, the PCRA court found that the adaptive skills and behaviors in relation to Appellant's IQ indicated mental retardation.

Upon our review, we find that the PCRA court's findings are supported by substantial evidence and its legal conclusion is not clearly erroneous under *Miller*, 585 Pa. at 144, 888 A.2d at 624. The evidence plainly supports the finding that Appellant was identified as a mentally retarded person before his eighteenth birthday. *See* N.T., April 21, 2004, at 19 (testimony of Dr. Elizabeth McPherson that Appellant "had been diagnosed as mentally retarded in the school system and had been in special education classes throughout his schooling"); *id.* at 93 (testimony of Edward J. Dougherty, PhD., that Appellant "was identified actually in the first grade as being mentally retarded by the school system"). Various experts testified that Appellant's IQ was within the 70 to 75 range.

418

*See id.* at 60, 118–19. Given that Appellant's IQ is apparently above 70, this is a close case; however, both parties agree that it is possible for a person with an IQ ranging from 70 to 75 to suffer from mental retardation, depending upon the degree of adaptive deficits. In this regard, the testimony of Appellant's expert witnesses was consistent with the PCRA court's understanding that, in Appellant's case, such deficits were on a scale supporting the finding of mental retardation. Appellant was evaluated, *inter alia,* via a formal assessment instrument called the Adaptive Behavior Assessment System, identifying severe deficits in functional academic skills, self-direction, and work skills, as well as significant impairments in other areas, which, according to the expert testimony, meet the criteria for mental retardation in terms of severe impairment in at least two out of ten identified areas of adaptive skills and behaviors. *See* N.T., April 24, 2004, at 95–98; *see also id.* at 100 (testimony of Edward J. Dougherty, PhD., that Appellant, at 43 years of age, functions at a third-grade level and at a mental age of a nine-year-old child). Again, Appellant's three testifying mental health experts specifically opined that he meets the criteria for mental retardation under the DSM–IV and AAMR standards. *See id.* at 20, 59, 120–21.

As the PCRA court's findings are supported by substantial evidence and its legal conclusion is not clearly erroneous, its determination that Appellant is mentally retarded is affirmed, and its orders are modified to reflect the imposition of a life sentence, subject to appellate merits review of Appellant's guilt-phase claims. The matter is transferred to the Superior Court to conduct the necessary merits review, as this is now a non-capital case.

Jurisdiction is relinquished