COMMONWEALTH of Pennsylvania,
Appellee

v.

Andy RIVERA–RODRIGUEZ,
Appellant.

Superior Court of Pennsylvania.

Submitted Nov. 28, 2011.

Filed Feb. 23, 2012.

Vincent J. Quinn, Lancaster, for appellant.

Kelly M. Sekula, Assistant District Attorney, Lancaster, for Commonwealth, appellee.

BEFORE: BOWES, COLVILLE,* and

* Retired Senior Judge assigned to the Superior Court.

FITZGERALD,** JJ.

OPINION BY BOWES, J.:

Andy Rivera–Rodriguez appeals from the April 21, 2011 order denying him PCRA relief. We affirm the PCRA court's determination that trial counsel did not provide ineffective assistance by advising Appellant to proceed to a nonjury trial in order to obtain the Commonwealth's agreement not to seek the death penalty. Hence, we affirm.

The present case concerns Appellant's participation in the January 17, 2004 death of Ryan Gardina. After litigating an unsuccessful motion to suppress his confession, which involved five days of hearings, Appellant elected to proceed to a nonjury trial, where this criminal action was tried with two other cases. Appellant was convicted of first degree murder, robbery, and conspiracy based upon the following evidence. On the night of the murder, police stopped Appellant and Esteban Torres Sanchez after Sanchez committed numerous traffic violations while driving Mr. Gardina's car. Sanchez failed to provide a driver's license, registration, or proof of ownership. The following morning, Mr. Gardina's family reported that the victim was missing; his body was later found behind Sanchez's home.

On January 18, 2004, police asked Appellant to come to the police station, and he arrived there of his own accord. After he received his *Miranda* rights and waived them, Appellant was questioned about Mr. Gardina's death. He eventually signed a written statement admitting that he was involved in Mr. Gardina's robbery and murder. Specifically, Appellant told police the following. On the night of January 17, 2004, Appellant was walking alone when Mr. Gardina stopped his car beside Appellant and asked Appellant if he knew where to purchase a small amount of marijuana. Appellant told the victim he could obtain marijuana for him and, after entering the victim's vehicle, directed him to Sanchez. After Sanchez entered the car, Appellant told Sanchez, in Spanish, that he wanted to take Mr. Gardina to the lot behind Sanchez's residence, rob him, and kill him. When they arrived at their destination, Appellant held down Mr. Gardina while Sanchez stabbed him to death. The two men then robbed the victim.

On January 10, 2005, Appellant was sentenced to life imprisonment plus twenty-three to forty-six years incarceration. On appeal, Appellant raised five challenges to the admissibility of his confession. On November 21, 2005, we rejected his allegations and affirmed. *Commonwealth v. Rivera–Rodriguez*, 894 A.2d 823 (Pa.Super.2005) (unpublished memorandum). On September 14, 2006, our Supreme Court denied review. *Commonwealth v. Rivera–Rodriguez*, 589 Pa. 720, 907 A.2d 1102 (2006).

Appellant filed a timely PCRA petition on September 27, 2007. Counsel was appointed and filed an amended petition. In that petition, Appellant maintained that trial counsel rendered ineffective assistance when they advised him to waive his right to a jury trial in exchange for the Commonwealth's agreement not to seek the death penalty. Appellant averred that this advice was infirm because trial counsel, who were aware that Appellant's intelligence quotient was 58, knew that the Commonwealth could not obtain the death penalty due to his low mental functioning. After two days of hearings, the PCRA court denied relief, and this appeal followed.

On appeal, Appellant presents this issue: "Whether trial counsel were ineffective

** Former Justice specially assigned to the Superior Court.

when they counseled the defendant to waive his right to a jury trial in exchange for the Commonwealth's agreement not to seek the death penalty when the defendant was mentally-retarded and could not have received the death penalty?" Appellant's brief at 4.

■ "Under our standard of review for an appeal from the denial of PCRA relief, we must determine whether the ruling of the PCRA court is supported by the record and is free of legal error. The PCRA court's credibility determinations are binding on this Court when they are supported by the record. However, this Court applies a *de novo* standard of review to the PCRA court's legal conclusions." *Commonwealth v. Chmiel*, —— Pa. ——, 30 A.3d 1111, 1127 (2011) (citations omitted). In order to

> prevail on a claim of ineffective assistance of counsel, a petitioner must overcome the presumption that counsel is effective by establishing all of the following three elements . . .: (1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's ineffectiveness.

*Id.* at 1127.

We begin our discussion with an analysis of the decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In that case, the United States Supreme Court held that imposition of the death penalty upon individuals who are mentally retarded violates the Eighth Amendment's prohibition against cruel and unusual punishment. The United States Supreme Court determined that there was a national consensus against imposition of the death penalty on mentally-retarded individuals and concluded that it was thereby unconstitutional.

However, the Court also acknowledged that there were disagreements among the states on "determining which offenders are in fact retarded." *Id.* at 317, 122 S.Ct. 2242. The Supreme Court indicated: "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* It continued: "As was our approach in *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, 'we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.' *Id.*, at 405, 416–417, 106 S.Ct. 2595." *Atkins, supra* at 317, 122 S.Ct. 2242. It noted that the "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.* at 318, 122 S.Ct. 2242.[1] Thus, the Court expressly committed to the discretion of the states to arrive at a definition of what constitutes mental retardation.

In the *Atkins* case, the defendant's IQ was 59, falling within the category of mild retardation, and Virginia disputed that he suffered from that condition. The case was remanded for proceedings consistent with the pronouncements contained therein. Thus, even though the defendant therein had an IQ of 59, the Supreme Court did not vacate his death penalty; rather, it remanded for the state court to determine whether that defendant could be sentenced to death.

---

1. Our Supreme Court subsequently defined mental retardation in the case of *Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624 (2005), which was promulgated after Appellant's trial.

In the present case, Appellant was tried in 2004, after *Atkins* was disseminated. He had the assistance of two public defenders during his pretrial and trial proceedings; John Kenneff, who is now deceased, was lead counsel, and Douglas A. Conrad assisted Mr. Kenneff. Mr. Conrad testified as follows at the PCRA hearing. He and Mr. Kenneff were notified by the Commonwealth that it intended to seek the death penalty. After litigating the unsuccessful suppression motion, he and Mr. Kenneff had discussions with the district attorney's office about the death penalty. Since Appellant wanted to proceed to trial, trial counsel recommended to him that he proceed nonjury in exchange for the Commonwealth's withdrawal of its decision to seek the death penalty. This decision was made on December 22, 2004.

As of that date, trial counsel were well aware of the 2002 decision in *Atkins* and that Appellant's IQ was 58. Indeed, during litigation of the suppression motion, Appellant's mental capacity to understand his constitutional rights was extensively litigated. After the confession was ruled admissible by the trial court, counsel were concerned about the possibility that the Commonwealth, despite Appellant's IQ, would be successful in obtaining the death penalty against Appellant.

Mr. Conrad observed that, as outlined in *Atkins, supra,* the definition of mental retardation was not based solely on IQ but also on the defendant's adaptive functioning. He continued that herein, the "Commonwealth was—was prepared to bring evidence in as far as [Appellant's] adaptive functioning." N.T. 2/16/11, at 192. Mr. Conrad, who also represented Appellant regarding a 2002 drug matter, indicated that Appellant was able to understand and communicate effectively. Thus, while Appellant "was a little slow, ... he still un-derstood the concepts and what was going on." *Id.* at 196.

Mr. Conrad and Mr. Kenneff obtained all of Appellant's records, which placed him in the category of mild or moderate retardation, and then retained an expert witness to review Appellant's cognitive abilities. That expert informed counsel that Appellant "appeared to be functioning at a higher IQ than he tests." *Id.* at 199. Appellant had a job and a girlfriend, both of which established that he had adaptive functioning. He also had a prior criminal record. Additionally, there was testimony from Appellant's friends at the suppression hearing that Appellant "appeared normal to them." *Id.* at 201.

Facing trial and the specter of death for Appellant, counsel thus remained uncertain whether a jury would determine that Appellant was mentally retarded. Indeed, as Appellant's trial approached, they just had lost a death penalty case defended on the basis of the defendant's mental retardation. Mr. Conrad stated that there was no guarantee that Appellant would not be sentenced to death. *Id.* Thus, counsel advised Appellant to accept the offer of the Commonwealth to retract its decision to seek the death penalty in exchange for Appellant's assent to proceed to a nonjury trial. After discussion, Appellant agreed with this recommendation.

The record clearly supports the PCRA court's determination herein. Counsel were aware of the pertinent law and Appellant's background and IQ. They thoroughly investigated the issue and determined that there was simply no way to be certain that Appellant would not be sentenced to death. In light of the facts in question, especially the chilling nature of Appellant's confession, as well as the fatal consequences at issue, we are compelled to affirm the PCRA court's conclusion that counsel made a reasonable tactical decision when

they advised Appellant to proceed nonjury to avoid death. Hence, they did not render ineffective assistance. *See Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997, 1018–19 (2007) ("To sustain a claim of ineffectiveness, [the defendant] must prove that the strategy employed by trial counsel was so unreasonable that no competent lawyer would have chosen that course of conduct.").

Order affirmed.

