J-S16006-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
                                            :          PENNSYLVANIA
                                            :
                v.                          :
                                            :
                                            :
ERIC T. JONES                      :
                                            :
                      Appellant       :          No. 1826 EDA 2020

Appeal from the PCRA Order Entered August 26, 2020
In the Court of Common Pleas of Monroe County Criminal Division at
No(s):  CP-45-CR-0001925-2017

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JULY 07, 2021**

Appellant, Eric T. Jones, appeals from the post-conviction court's August 26, 2020 order denying his petition filed under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.  After careful review, we affirm.

The PCRA court summarized the pertinent facts and procedural history of this case, as follows:

> [Appellant] was charged with killing Morgan McGhee, who was his girlfriend and the mother of his infant daughter, by shooting her twice on July 10, 2017[,] at their residence in Tobyhanna, Pennsylvania.  [Appellant] entered a *nolo contendere* plea to murder in the first degree on October 15, 2018[,] and was sentenced on the same day to life in prison without parole. [Appellant] did not file a direct appeal from the sentencing order.
>
> [On June 17, 2019, Appellant filed a PCRA petition.]  On June 19, 2019, this court appointed Brian Gaglione, Esq.[,] to represent [Appellant,] and gave … [Appellant] leave to file an amended PCRA petition.  On August 6, 2019, this court gave defense

---

[*] Former Justice specially assigned to the Superior Court.

counsel an extension of time to file a brief. Attorney Gaglione did not file an amended petition[] but[,] instead[,] on October 16, 2019, he requested a hearing to present evidence on [Appellant's] contention that his trial counsel was ineffective. Specifically, [Appellant] claimed his trial lawyer misled him to believe that pending legislation in Pennsylvania would result in his being eligible for parole if he entered a *nolo contendere* plea to first[-] degree murder. A hearing on the motion was scheduled for December 19, 2019[,] and arrangements were made for [Appellant] to appear by teleconference.

The hearing on December 19, 2019[,] was continued to January 24, 2020[,] due to technical difficulties in establishing a video connection with [Appellant] in state prison that morning.

Attorney Gaglione filed a motion on January 6, 2020[,] advising that he had ended his employment with the county as conflict counsel and requesting that new counsel be appointed to represent [Appellant]. The court appointed Robert A. Saurman, Esq.[,] as new counsel for [Appellant] on January 9, 2020. On January 24, 2020, a hearing was held on the PCRA motion and the parties were directed to file briefs. On March 5, 2020, [Appellant] filed his brief in support of his PCRA petition.

In his brief…, [Appellant] raised the issue of whether he was competent to understand the *nolo contendere* plea at the time he entered it. He attached to his post-hearing brief a neuropsychological evaluation performed by a defense expert as part of preparation for [Appellant's] murder trial. The Commonwealth expressed surprise, as it had not been put on notice of this defense, and requested an additional hearing based on the new claim. This motion was granted, and a hearing was held on June 19, 2020[,] to give the Commonwealth an opportunity to address the issue of [Appellant's] competence at the time of the *nolo contendere* plea.

PCRA Court Opinion (PCO), 8/26/20, at 1-2 (unnecessary capitalization omitted).

On August 26, 2020, the court issued an order and opinion denying Appellant's PCRA petition. He filed a timely notice of appeal, and he complied with the PCRA court's order to file a Pa.R.A.P. 1925(b) concise statement of

- 2 -

errors complained of on appeal. Herein, Appellant states two issues for our review:

A. Did the PCRA court err and abuse its discretion by not finding trial counsel ineffective for failing to properly [*sic*] communicate with [Appellant] … regarding the legal effect of his plea of guilty both in terms of possisble [*sic*] sentence and in terms of the potential effects o[f] future legislation?

B. Did the PCRA court err and abuse its discretion by not finding trial counsel ineffective for failing to follow up on evaluations suggesting that [Appellant] might suffer from severe cognative [*sic*] disabilities?

Appellant's Brief at 4.

To begin, we note that, "[t]his Court's standard of review from the grant or denial of post-conviction relief is limited to examining whether the lower court's determination is supported by the evidence of record and whether it is free of legal error." ***Commonwealth v. Morales***, 701 A.2d 516, 520 (Pa. 1997) (citing ***Commonwealth v. Travaglia***, 661 A.2d 352, 356 n.4 (Pa. 1995)). Where, as here, a petitioner claims that he received ineffective assistance of counsel, our Supreme Court has stated that:

[A] PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." Generally, counsel's performance is presumed to be constitutionally adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner. To obtain relief, a petitioner must demonstrate that counsel's performance was deficient and that the deficiency prejudiced the petitioner. A petitioner establishes prejudice when he demonstrates "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." … [A] properly pled claim of ineffectiveness posits that: (1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice befell the petitioner from counsel's act or omission.

***Commonwealth v. Johnson***, 966 A.2d 523, 532-33 (Pa. 2009) (citations omitted).

In Appellant's first issue, he claims that his trial counsel was ineffective for failing to communicate to Appellant that he was entering a plea to first-degree murder and would be sentenced to life imprisonment, without the possibility of parole. According to Appellant, he "believed that he was entering a plea to the charge of general homicide" and that the court would determine at sentencing if he would receive a term of life imprisonment for first-degree murder, or a lesser sentence consistent with third-degree murder. Appellant's Brief at 10.

Notably, Appellant acknowledges that, "[w]hen a defendant enters a plea on [the] advice of counsel, the voluntariness of that plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." ***Id.*** at 11-12 (citing ***Commonwealth v. Moser***, 921 A.2d 526, 531 (Pa. Super. 2007)). However, Appellant at no point explains what advice his trial counsel provided him about the plea, or how that advice was inadequate. Instead, Appellant only avers, in general terms, that he and his trial counsel were "on different plains [*sic*] of understanding[,]" which ultimately led him to enter a plea that was involuntary, unknowing, and unintelligent. ***Id.*** at 12.

Appellant's argument is insufficient to establish that trial counsel acted ineffectively. As the PCRA court pointed out in its opinion, counsel testified at the PCRA hearing about his conversations with Appellant concerning the plea, as follows:

> [Trial Counsel:] We [counsel and co-counsel] met with [Appellant] obviously more than the day before jury selection over the course of the entire case. I met with [Appellant] multiple times…. During each conversation when we would discuss a plea, I certainly informed [Appellant] that [first-degree] murder … would be a life sentence. No ifs, ands or buts, life means life. There is no possibility of parole. You will serve a life sentence. And at that time[,] there were significant differences between that and receiving a death sentence.

PCO at 5 (quoting N.T. PCRA Hearing, 1/24/20, at 12).

Moreover, during the plea colloquy, Appellant repeatedly expressed his understanding that he was pleading guilty to first-degree murder and would receive a life sentence of incarceration, without the possibility of parole. *See id.* at 6-8 (quoting N.T. Plea, 10/15/18, at 5-13). He also confirmed that he had sufficiently discussed the plea with counsel, he was satisfied with counsel's advice, and that he had no questions for the court. *Id.* at 7. Appellant's trial counsel also stated during the colloquy that he had discussed the plea with Appellant and his family on several occasions. *Id.* at 8. Thus, the record demonstrates that trial counsel adequately communicated with Appellant about the consequences of entering the plea, and that Appellant was aware he was pleading *nolo contendere* to first-degree murder and would be

sentenced to life imprisonment without parole.[1] Because Appellant does not claim that his trial counsel gave him specific advice or information that caused him to misunderstand the implications of his *nolo contendere* plea, we conclude that his first issue is meritless.

Next, Appellant claims his trial counsel acted ineffectively by not "follow[ing] up on evaluations suggesting that [Appellant] []might suffer from severe cognitive disabilities[.]" Appellant's Brief at 16 (unnecessary capitalization omitted). Appellant explains that, prior to trial, his counsel obtained a "Neuropsychological Evaluation" of Appellant, revealing that Appellant's IQ is 74. **Id.** According to Appellant, this constitutes a "borderline IQ" and counsel should have obtained further evaluations to discern if Appellant could be deemed intellectually disabled, thereby precluding imposition of the death penalty under **Atkins v. Virginia**, 536 U.S. 304, 321 (2002) (holding that the death penalty "is excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender") (internal quotation marks and citation omitted).

---

[1] We also point out that, if Appellant truly misunderstood that he would receive a sentence of life imprisonment for his plea to first-degree murder, he obviously discovered this fact when he was sentenced, and he could have at that point filed a post-sentence motion to withdraw his plea for the reasons he sets forth herein. His failure to do so waives for our review his argument that his plea was involuntary, unknowing, and unintelligent. **See** 42 Pa.C.S. § 9543(a)(3) (stating that, to be eligible for PCRA relief, a petitioner must prove "[t]hat the allegation of error has not been previously litigated or waived"); 42 Pa.C.S. § 9544(b) ("For purposes of this subchapter, an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding.").

*See also Commonwealth v. Sanchez*, 36 A.3d 24, 63 (Pa. 2011) (developing the procedure for deciding *Atkins* claims; holding that (1) it the burden of the proponent of the *Atkins* claim to prove intellectual disability by a preponderance of the evidence, (2) the finding of an intellectual disability, for purposes of death-penalty ineligibility, must be unanimous, and (3) the jury should decide the *Atkins* question before proceeding to the consideration of the aggravating and mitigating factors). Appellant insists that, had his trial counsel attempted to establish that Appellant could not be sentenced to death because he is intellectually disabled, the plea

> negotiation positions would have switched from the [d]eath penalty down to [the first-degree m]urder … situation in which [Appellant's] plea was taken, to [first-degree m]urder to [third-degree m]urder…. By not pursing the possible *Atkins* disqualification for [Appellant] from the death penalty, the defense put [Appellant] in a position where the plea to [first-degree] murder … was what was offered by the Commonwealth[,] rather than a potentially much better offer. Had this line of inquiry been aggressively pursued, it is reasonable to determine that a plea to [third-degree] murder … could have been [obtained].

Appellant's Brief at 18.

Our Supreme Court has addressed how a PCRA petitioner may establish that he or she has an intellectual disability that would preclude the death penalty under *Atkins*. *See Commonwealth v. Knight*, 241 A.3d 620 (Pa. 2020); *Commonwealth v. Miller*, 888 A.2d 624 (Pa. 2005). In *Knight*, the Court explained:

> We considered in *Miller* the definition of intellectual disability used by the American Association of Mental Retardation ("AAMR"), now the American Association on Intellectual and Developmental

Difficulties ("AAIDD"), and the American Psychiatric Association ("APA") standard set forth in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1992) ("DSM–IV"). The AAMR defines intellectual disability as a "disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in the conceptual, social, and practical adaptive skills." *Miller*, 888 A.2d at 629–30 (quoting Mental Retardation: Definition, Classification, and Systems of Supports 1 (10th ed. 2002)). The APA's definition, as set forth in the DSM–IV, defines "mental retardation" as "significantly subaverage intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." *Miller*, 888 A.2d at 630 (quoting DSM–IV at 37).

We noted in *Miller* that the above definitions share three concepts: limited intellectual functioning, significant adaptive limitations, and onset prior to age 18. Regarding the concept of limited intellectual functioning, we explained:

> Limited or subaverage intellectual capability is best represented by IQ scores, which are approximately two standard deviations (or 30 points) below the mean (100). The concept should also take into consideration the standard error of measurement (hereinafter "SEM") for the specific assessment instruments used. The SEM has been estimated to be three to five points for well-standardized measures of general intellectual functioning. Thus, for example, a subaverage intellectual capability is commonly ascribed to those who test below 65–75 on the Wechsler scales.

*Id.* at 630 (citations omitted).

Recognizing that, pursuant to both the AAMR and DSM–IV, a low IQ score is not, in and of itself, sufficient to support a classification of intellectually disabled, we considered the factors relevant to the second prong – the existence of limitations in adaptive behavior:

> Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives, and limitations on adaptive behavior are reflected by difficulties adjusting to ordinary demands made in daily life. The AAMR recommends that such limitations should be established through the use of standardized measures. "On these standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is at least two standard

deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills."

*Id.* at 630–31 (citations and footnote omitted). Under the AAMR, conceptual skills include, *inter alia*, language, reading, and writing abilities, and the understanding of money, time, and number concepts; social skills include, *inter alia*, interpersonal skills, social responsibility, and the ability to follow rules; and practical skills include, *inter alia*, personal care, travel and transportation, meal preparation, and money management. *Id.* at 630 n.8.

This Court did not discuss at length in *Miller* the third concept — age of onset — stating, "[w]e see no need to explore the concept of age of onset further, since this requirement is self explanatory and both the AAMR and the DSM–IV require that the age of onset be before age 18." *Id.* at 630 n.7.

In sum, we stated:

What is clear from the above is that [the AAMR and the DSM–IV] definitions are very similar and diagnosis under either system of classification takes into account like considerations. Therefore, we hold that a PCRA petitioner may establish his or her mental retardation under either classification system and consistent with this holding, assuming proper qualification, an expert presented by either party may testify as to mental retardation under either classification system. Moreover, consistent with both of these classification systems, we do not adopt a cutoff IQ score for determining mental retardation in Pennsylvania, since it is the interaction between limited intellectual functioning and deficiencies in adaptive skills that establish mental retardation.

*Id.* at 631.

In … *Sanchez*, … this Court held that a "colorable *Atkins* issue" should be submitted to the jury for a penalty phase decision. [*Sanchez*, 36 A.3d] at 62. However, "an *Atkins* claim is not properly for the factfinder unless there is competent evidence to support the claim, under the standard announced in *Miller*." *Id.* at 62 n.19.

***Knight***, 241 A.3d at 629-31.

Here, the PCRA court determined that Appellant's counsel had adequately explored the possibility of raising an ***Atkins*** claim, and it ultimately concluded that Appellant would have been unable to prove that he is intellectually disabled. The court explained:

> [T]he burden of proof in these PCRA proceedings is on [Appellant], who must prove by a preponderance of the evidence that counsel was ineffective in failing to properly assert an ***Atkins*** defense. Here, [Appellant] has presented no expert testimony on the question of his mental retardation, and the death penalty was not imposed in this case. [Appellant] argues that if the ***Atkins*** defense was raised it would have given him greater bargaining power and the ability to avoid a life without parole sentence. [Appellant] attached [to his petition] the draft report of Carol L. Armstrong, Ph.D., a mitigation specialist his trial counsel hired. In her report, she found that [Appellant's] IQ was 74.
>
> At the hearing held on June 19, 2020, the Commonwealth called Juandalynn Taylor, Ph.D., J.D. Dr. Taylor was retained by [Appellant's] trial counsel as a death penalty mitigation specialist. She testified that when she [is] retained, "one of the things we do immediately is to look for or investigate whether or not we have enough information to put forth an ***Atkins*** claim." [N.T. Hearing, 6/19/20, at 12.]. She investigated [Appellant's] intellectual functioning and his adaptive functioning. She [also] retained [Dr.] Armstrong, a neuropsychologist, to administer a full-scale IQ evaluation and intellectual function test. ***Id.*** [at] 13. Dr. Armstrong found [Appellant's] full-scale IQ to be 74. His adaptive functioning rankings were consistent with his IQ. ***Id.*** [at] 15. [Appellant's] scores suggested a borderline IQ, but she also found that he was a person who could function in society without assistance. ***Id.***
>
> Dr. Taylor conducted an [Adaptive Behavior Assessment System ("ABAS")] test to determine how independently [Appellant] was able to function. He was tested in three areas: communication, practical[,] and social functioning. Dr. Taylor testified that if the individual being tested does not need assistance in these three areas, he does not have deficiencies in adaptive functioning. ***Id.***

The test results showed that [Appellant] was able to communicate and perform tasks of daily living in his work, family[,] and social affairs. Dr. Taylor advised [Appellant's] trial counsel that [Appellant] did not meet the threshold to advance an *Atkins* argument at the penalty phase of the death penalty trial. *Id.* [at] 19.

[Appellant's] … trial counsel[] testified that after receiving the results of the investigation and testing done by Dr. Armstrong and Dr. Taylor, and discussion with [Appellant], the defense team decided that [Appellant] was not laboring under mental retardation that would support an *Atkins* defense. [*Id.* at] 31.

[Appellant] has offered no testimony to refute Dr. Armstrong['s] and Dr. Taylor's findings[,] and Dr. Taylor's recommendations to his counsel. [This court] found Dr. Taylor's testimony to be credible and supported by her findings and those of Dr. Armstrong.

PCO at 13-14.

On appeal, Appellant challenges the PCRA court's decision by claiming that the ABAS test used by Dr. Taylor to determine if Appellant had a viable *Atkins* claim was inadequate, as "this test is based on self-reported capabilities rather than any external evaluations." Appellant's Brief at 18. He further contends:

In [Appellant's] case, the test was administered to [Appellant] and his mother alone. Certainly[,] the assessments of an individual and their [m]other can be very insightful, but they also have significant potential for false impression reporting, exaggeration, and minimalization of negative features to avoid embarrassment. Anyone who has worked in the field of mitigation is aware that individuals will often misrepresent truth to avoid embarrassment even when such truth would be significant in life[-]saving mitigation efforts. Therefore[,] to decide not to further pursue *Atkins* issues based solely on self[-]reported functioning is not an acceptable decision in a life and death situation. Counsel was ineffective for fail[ing] to insure [*sic*] more complete testing and, as a result, [Appellant] is entitled to the reversal of his plea of guilty to allow this issue to be further explored.

- 11 -

***Id.*** at 18-19.

We are unconvinced. Appellant failed to present any evidence at the PCRA hearing to challenge the accuracy of the ABAS test utilized by Dr. Taylor, or to attack the validity of her conclusion that Appellant would not have a valid ***Atkins*** defense. Thus, the record supports the PCRA court's decision that Appellant's trial counsel acted effectively in investigating Appellant's intellectual abilities and relying on Dr. Taylor's conclusions.

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 7/7/2021*