J-S69035-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JEROME GIBSON | |
| Appellant | No. 584 EDA 2014 |

Appeal from the PCRA Order entered January 21, 2014
In the Court of Common Pleas of Bucks County
Criminal Division at No: CP-09-CR-0005119-1994

BEFORE:  GANTMAN, P.J., FORD ELLIOTT, P.J.E., and STABILE, J.

MEMORANDUM BY STABILE, J.:                    **FILED JANUARY 16, 2015**

Jerome Gibson is serving a life sentence for his conviction of first-degree murder and related offenses.  He appeals from an order dismissing as untimely his second petition under the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-46.  Because the PCRA court correctly concluded that the petition fails to meet the exceptions to the PCRA's time bar, we affirm.

On September 29, 1994, Gibson shot and killed 76-year-old Robert Berger during a robbery in Bristol Borough, Bucks County.

> [That] morning . . . , Gibson sought to obtain an automobile, as his car had recently broken down.  He asked a friend, Sean Hess, for $200 so that he could purchase a new vehicle.  When Hess refused, Gibson spoke of "making a move," meaning that he would commit a robbery.
>
> At approximately noon on that same day, Gibson went to an automobile dealership in Bristol Township to look for a replacement vehicle.  Although he expressed an interest in purchasing a vehicle that was shown to him by salesman Glen

Kashdan, he did not have the necessary funds. He told Kashdan, however, that his mother maintained sufficient funds in a bank account in Bristol Borough to pay for the vehicle. After Kashdan drove Gibson to the bank in a fruitless effort to withdraw the non-existent funds, he dropped Gibson off at a shopping center in Bristol Township, about one mile from the eventual scene of the crime. Gibson was wearing a dark hooded sweatshirt and jeans.

Melissa Paolini, who worked at the bank where Kashdan had taken Gibson, observed the two men enter the bank at approximately 1:15 p.m. Gibson's picture was taken by the bank's monitor camera and was later identified by Paolini at trial. The picture clearly depicted Gibson wearing a dark hooded sweatshirt.

Shortly before 2:00 p.m., Gibson met Paulinda Moore, a long-time acquaintance, in the shopping center. Gibson showed Moore a handgun that was tucked into the waistband of his pants and stated that he needed money and was going to rob somebody. He added that if his prospective victim saw his face, he would shoot him. Gibson and Moore then parted company and Gibson continued on foot to Bristol Borough.

Kevin Jones, another acquaintance, encountered Gibson a little while later. Gibson informed Jones that he knew "a guy that had money," whom he was going to rob, killing him if necessary.

At approximately 2:00 p.m., Vera DuBois, Gibson's aunt, saw Gibson on foot in Bristol Borough and noticed that he was wearing a dark hooded sweatshirt. At 2:20 p.m., Gibson entered a jewelry store. Leonard Wilson, the store's proprietor, became suspicious of Gibson when he noticed that Gibson appeared to be observing the store itself, rather than looking at jewelry. After a brief conversation with Wilson, Gibson left the store.

Between 2:30 and 3:00 p.m., Kimberly Rankins, another acquaintance, nearly hit Gibson with her car as he was crossing Mill Street in the direction of the Ascher Health Care Center ("Ascher Health") in Bristol Borough. The last time that Rankins observed Gibson that day, he was wearing a dark blue sweatshirt and was approximately twenty-five feet away from the entrance of Ascher Health, walking towards it.

Shortly before 3:00 p.m., Michael Segal, a shopkeeper at a store directly across the street from Ascher Health, heard a gunshot

- 2 -

from inside Ascher Health. Segal looked across the street and saw Robert Berger, the proprietor of Ascher Health, struggling with an assailant behind the store counter. When Segal observed that the assailant had a gun, he dialed "911." While on the telephone, he heard two more gunshots. He looked across the street and saw Berger lying on the floor while the assailant rifled through the cash register drawers. Segal then observed the assailant leave the store, stuffing items into his pants, and walk up Mill Street towards an apartment building. Segal was unable to see the assailant's face, but he did observe that the man was wearing a dark blue hooded sweatshirt. Segal later testified at trial that the man's size, build and complexion matched those of Gibson.

Alfonso Colon, who was in a second floor apartment above Ascher Health that afternoon, walked downstairs and went outside after hearing the three gunshots. He saw Gibson, whom he positively identified at trial, leaving Ascher Health and walking toward him while stuffing an object that appeared to be a handgun into his pants. Upon seeing Colon, Gibson crossed Mill Street and headed in a different direction.

At 2:58 p.m., the police responded to Segal's call. They entered Ascher Health and found Berger lying dead on the floor from gunshot wounds. A cash drawer was open and there was an empty gun holster on the floor. Berger was pronounced dead upon arrival at the hospital at approximately 3:45 p.m. An autopsy revealed that he had suffered three gunshot wounds: a fatal wound to the left chest, a wound to the upper right chest, and a wound to the upper left arm. Two .32 caliber projectiles were removed from the body. It was later determined that approximately $1,400 in cash had been stolen during the robbery, along with a .38 caliber handgun belonging to Berger. There was no evidence that Berger's gun had been fired during the robbery.

Shortly after 3:00 p.m. on the day of the shooting, Gibson arrived at the home of his cousin, Pamela Harrison. When Harrison responded to Gibson's knock on her door, she observed that he was wearing a dark hooded sweatshirt and was sweating. Harrison also heard police sirens. Gibson asked to come into the house and Harrison admitted him, noticing that he was carrying a handgun. After hiding his sweatshirt in Harrison's basement, Gibson left the house. He returned later that evening and retrieved the sweatshirt without Harrison's permission.

- 3 -

After leaving Harrison's house, Gibson met his friend, Sean Hess, in the shopping center where Gibson had been earlier that day. Gibson told Hess that he had shot a man three times and taken his money. Gibson also stated that the victim had a gun, but that he had used his own gun.

The following day, while at a bar, Gibson admitted to Bernard Mc[L]ean that he had shot the old man in Bristol three times, explaining that he had been broke and needed the man's money. He later told his friends, Herman Carroll and Eddie Jones, that he had robbed and killed the victim. He also told Edward Gilbert, another friend, that he had killed the victim to obtain money with which to purchase a vehicle. He gave Gilbert the .32 caliber handgun, along with Berger's .38 caliber handgun, to keep for him. Berger's gun was later recovered at a motel in Bristol Township, but Gibson's gun was never located.

On October 2, 1994, three days after the murder, two detectives from the Bucks County District Attorney's Office, who had received information implicating Gibson in the murder, went to the apartment where Gibson was staying and waited outside in their car. Shortly thereafter, Gibson and some other individuals came out of the apartment. Gibson approached the detectives and asked them if they wished to speak with him. In response to Gibson's inquiry, the detectives told him that they wished to talk to him about a murder that had occurred on Mill Street on September 29, 1994. Gibson asked if he was under arrest and the officers replied that he was not. They suggested, however, that Gibson speak with them at the Bristol Borough Police Station, since there were other people nearby. The detectives made it clear that Gibson could proceed to the station by his own transportation, that he would be free to leave the station at any time, and that he could terminate the conversation whenever he wished. Gibson acquiesced and followed them to the police station in his own vehicle, which he had purchased the day after the shooting.

Upon arriving at the police station, the detectives led Gibson to an interview room, where another detective and a Bristol Borough police officer joined them. Gibson was again advised that he was not under arrest and could leave the station at any time. When the detectives told Gibson that they wanted to discuss the robbery and murder of Berger, he indicated that he wanted to clear the matter up and would speak with them. The interview lasted for a little over two hours, during which Gibson

- 4 -

not only denied any culpability for the shooting, but also denied having been in Bristol Borough at any time after August 2, 1994. Following the interview, Gibson agreed to a search of his vehicle and signed a consent form. During the search, Gibson initiated a conversation with one of the detectives, asking him a hypothetical question regarding what would happen if someone were attacked by a man with a gun and shot and killed his attacker. Gibson then left the police station in his vehicle.

On October 6, 1994, Gibson was arrested and charged with the robbery and murder of Berger, as well as possession of instruments of crime.[1] Bail was denied, and while Gibson was incarcerated pending trial, he admitted to inmates Glenn Pollard, Kenneth Johnson and Kevin Jones that he had committed the crimes. Prior to trial, Gibson moved to suppress his statements to the police during the October 2, 1994 interview, as well as the statement that he made to the detective during the search of his car. The motion was denied following a hearing, and the case proceeded to trial.

During the guilt phase of trial, the Commonwealth presented the testimony of the numerous witnesses who had seen or spoken with Gibson either immediately before or after the shooting, including the testimony of those witnesses to whom Gibson had inculpated himself. Additionally, several detectives and police officers testified for the Commonwealth concerning their observations of the crime scene, the collection of evidence, and the statements that Gibson made during the course of his interview, as well as his hypothetical question concerning the shooting.

Gibson presented five witnesses whose testimony supported his alibi defense and contradicted the testimony of certain inmates who had testified concerning his inculpatory statements. Gibson also took the stand and testified that he was not on Mill Street on the afternoon of the murder, but did admit that he had been with Kashdan, the car salesman, at the bank in Bristol Borough earlier that day. Gibson further admitted that he had lied to the police concerning his whereabouts on the day of the murder.

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 3701, and 907.

*Commonwealth v. Gibson (Gibson I)*, 720 A.2d 473, 476-78 (Pa. 1998).

The jury convicted Gibson of all three counts. After a penalty phase, the jury returned a verdict that Gibson be sentenced to death, and the trial court duly imposed the sentence. On direct appeal, our Supreme Court affirmed the conviction and death sentence, and the Supreme Court of the United States denied Gibson's petition for writ of *certiorari* on October 4, 1999. *Gibson v. Pennsylvania*, 528 U.S. 852 (1999).

Following direct review, on October 29, 1999, Gibson filed *pro se* a timely first PCRA petition. Current PCRA counsel assumed representation of Gibson and filed an amended PCRA petition and two supplements. Among other, numerous claims, Gibson raised *Brady*[2] violations. He contended the Commonwealth failed to turn over material that could have been used to impeach its witnesses, including Edward "Eddie" Jones, Glenn Pollard, Cyril "Moo Moo" Thomas, Kevin Jones, Edward Gilbert, Herman Carroll, and Bernard McLean. *See Commonwealth v. Gibson (Gibson III)*, 959 A.2d 962, No. 1778 EDA 2008, unpublished memorandum at 5-15 (Pa. Super. filed July 8, 2008). On May 22, 2002, the PCRA court denied guilt-phase relief, but granted Gibson a new penalty-phase hearing. The parties cross-appealed to the Supreme Court, which remanded for an evidentiary hearing

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963) (holding that the Due Process Clause of the Fourteenth Amendment requires prosecutors to give defendants any materially exculpatory evidence in their possession).

- 6 -

in light of the then-recent decision **Atkins v. Virginia**, 536 U.S. 304 (2002), under which the mentally retarded, *i.e.*, the intellectually disabled, cannot be executed.

On remand, Gibson attempted to add a new claim to his PCRA petition regarding the legality of his arrest by police. The PCRA court denied Gibson's request, but found that **Atkins** barred his execution. The case returned to the Supreme Court, which affirmed the PCRA court's finding that Gibson is intellectually disabled. **Commonwealth v. Gibson (Gibson II)**, 925 A.2d 167 (Pa. 2007). The Supreme Court modified Gibson's sentence to life without parole and transferred the case to this Court for adjudication of the remainder of Gibson's appeal. **Id.** at 171.

This Court affirmed the denial of PCRA relief in all respects except one: a layered ineffective assistance of counsel[3] claim regarding Gibson's competency to stand trial. **Gibson III**, 959 A.2d 962 (Pa. Super. 2008) (unpublished memorandum), *appeal denied*, 966 A.2d 570 (Pa. 2009). We vacated and remanded to the PCRA court for a hearing on that claim. Because Gibson challenged the effectiveness of PCRA counsel, the trial court appointed separate counsel to litigate the competency claim. On remand,

---

[3] In a layered ineffectiveness claim, a PCRA petitioner claims that a prior lawyer was ineffective for failing to raise the effectiveness of another prior lawyer. **See Commonwealth v. McGill**, 832 A.2d 1014, 1022-23 (Pa. 2003) (setting forth the framework for layered ineffectiveness claims).

separate counsel withdrew the competency claim at Gibson's behest. ***See generally*** N.T. PCRA Hearing on Remand, 11/5/09, at 3-17.

On January 29, 2010, Gibson, again represented by PCRA counsel, filed a *habeas corpus* petition in the United States District Court for the Eastern District of Pennsylvania, ***Gibson v. Beard***, docketed at No. 10-CV-0445. The federal district court granted Gibson's motion for discovery. In response, the Bucks County District Attorney's Office provided over 990 pages of material to PCRA counsel. In an accompanying affidavit, counsel for the Commonwealth averred:

> Pursuant to [the federal *habeas* c]ourt's [o]rder of September 16, 2011, I have reviewed the entire contents of the Bucks County District Attorney's criminal case file in <u>Commonwealth v. Jerome Gibson</u>, Bucks County Case No. 5119 of 1994 for any information that qualifies under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), for subsequent disclosure to Petitioner of any ***Brady*** information not previously provided to Petitioner.
>
> While the undersigned believes that all discoverable and/or ***Brady*** materials have been previously provided to [Gibson] through his trial and/or post-conviction counsel, either formally or informally, in an abundance of caution, the undersigned has made, and is forwarding to [Gibson's] counsel, a complete copy of all discoverable and ***Brady*** materials contained within the ***Gibson*** file.

Affidavit of Karen A. Diaz, Esq., Deputy District Attorney (Diaz Affidavit), 10/14/11, ¶¶ a-b.[4] On Gibson's request, the Commonwealth also provided

_____

[4] In his brief, Gibson selectively quotes the Diaz Affidavit, giving the impression that the Commonwealth admitted it was turning over previously-undisclosed ***Brady*** material:

*(Footnote Continued Next Page)*

copies of police report interviews of two witnesses from the file of an unrelated homicide (the Turner Rogers case),[5] and all police incident reports between 1993 and 1995 for trial witness Eddie Jones. Gibson then filed a supplemental *habeas* petition, and the federal court granted his motion to stay *habeas* proceedings so Gibson could return to state court to exhaust his claims.

On December 13, 2011, Gibson filed a PCRA petition entitled "Protective Petition for Habeas Corpus Relief Pursuant to Article I Section 14 of the Pennsylvania Constitution and Statutory Post-Conviction Relief under

*(Footnote Continued)* _____

> On October 14, 2011, the Commonwealth of Pennsylvania produced over 990 pages of documents to Appellant's counsel and filed an affidavit of counsel. **According to the affidavit, the Commonwealth produced "*Brady* information not previously provided to Petitioner"** and "all discoverable and *Brady* materials contained in the Gibson file" including "every police report, witness statement, laboratory reports, all criminal histories and other documents in connection to same that are contained within the file."

Appellant's Brief at 5 (quoting Diaz Affidavit) (emphasis added). The Commonwealth averred no such thing. A candid, forthright quotation of the Diaz Affidavit shows the Commonwealth merely averred that it searched the file **to determine whether any undisclosed *Brady* material existed**.

[5] ***Commonwealth v. Turner Rogers***, No. CP-09-CR-0005296-1994 (C.P. Bucks), *judgment aff'd*, 685 A.2d 1047 (Pa. Super. 1996) (unpublished memorandum), *appeal denied*, 698 A.2d 593 (Pa. 1997). The killing in the Turner Rogers case coincidentally happened on the same day as the murder in this case. As reflected in this Court's memorandum affirming the judgment of sentence, Turner Rogers was convicted of involuntary manslaughter for killing Jermaine Brown during an argument.

42 Pa.C.S. § 9542 et seq. and Consolidated Memorandum of Law," which we shall call Gibson's second PCRA petition. Gibson stated his belief that his case belongs in federal *habeas* court, but, citing nonspecific vagaries of PCRA law, claimed the second PCRA petition was necessary to protect his rights. *See* Second PCRA Petition, 12/13/11, ¶¶ 2-3. Gibson asserted he had received a number of the federal *habeas* discovery documents for the first time, and that they constituted ***Brady*** material. The ***Brady*** violations are based on the alleged suppression of impeachment material regarding the Commonwealth's witnesses at trial. In all Gibson advanced 12 separate ***Brady*** claims based on 19 documents. *See* PCRA Court Rule 1925(a) Opinion, 5/14/14, at 11. Those 19 documents were entered into evidence at the PCRA hearing as Exhibits D-5 to D-23.

PCRA Hearing Exhibits D-5 to D-10 pertain to Eddie Jones. Jones testified at trial that Gibson, while possessing a .38 caliber pistol, told other people he had killed a "cracker" during a robbery when the "cracker" pulled a gun. *Id.* at 11-12. Exhibits D-5 to D-9 are Bristol Township Police Department incident reports regarding Eddie Jones.[6] *Id.* The incident reports show that Eddie Jones gave a false name to police, and was involved in domestic disturbances, but was not arrested or convicted of any crimes.

---

[6] The Bristol **Township** Police Department did not arrest or charge Gibson, or participate in his prosecution. As the robbery and murder occurred in Bristol Borough, the Bristol **Borough** Police Department prosecuted Gibson. *See* PCRA Court Rule 1925(a) Opinion, 5/14/14, at 12-13 & n.5.

Exhibit D-10 is another Bristol Township Police incident report found in the case files of James "Jim Jim" Walker, Andre Mitchell a/k/a Andre Warren, Daniel "Bucky" Harris, and Cyril "Moo Moo" Thomas, each of whom was charged with attempting to murder Jones. *Id.* at 13-14. Exhibit D-10 reports that a person heard that Jones chased Walker while brandishing a shotgun following an argument. *Id.*

Exhibits D-11 to 13 pertain to Glenn Pollard, who was incarcerated with Gibson while Gibson was awaiting trial. Pollard testified he overheard Gibson say he had to shoot a person during a robbery attempt gone "haywire." *Id.* at 15 (quoting N.T. Trial, 3/10/95, at 396-401). In exchange for his testimony, the Commonwealth agreed to transfer Pollard out of maximum security—an agreement that was revealed at trial. Exhibits D-11 and 12 are letters Pollard sent to Commonwealth agents regarding the *quid pro quo* for his testimony, and are similar to another letter introduced at the first PCRA proceedings. *Id.* at 15-16. Exhibit D-13 is a transcript of Pollard's interview by Bristol Township Police in an unrelated case in which Pollard admitted to selling drugs.

Exhibits D-14 to 17 pertain to Cyril "Moo Moo" Thomas, who testified at trial that he received a .38 caliber handgun from Eddie Gilbert (who in turn had received it from Gibson) and hid it in a motel, where it was later recovered. *Id.* at 19. Thomas also admitted that he was hoping his testimony would help regarding charges of attempted murder and aggravated assault pending in juvenile court. *Id.* (quoting N.T. Trial,

3/9/95, at 302-03, 309, 313). The PCRA court noted all four of these exhibits were contained in Thomas's juvenile clerk of courts file, which was admitted into evidence at the hearing on Gibson's first PCRA petition. *Id.*

Exhibit D-18 pertains to Eric Jones, Kevin Jones's twin brother. Kevin Jones testified at trial that Gibson made known his plans to rob and kill, if necessary, an "old guy" and a "white devil." *Id.* at 22 (quoting N.T. Trial, 3/9/95, at 267-70, 272-75, 280-81). Kevin Jones admitted at trial that he was a serial felon. *Id.* Exhibit D-18 is a Bristol Township Police detective's notes of his interview of Eric Jones—who did not testify at Gibson's trial— during which Eric Jones inquired if his twin brother could get a deal for testifying against Gibson. *Id.* at 23.

Exhibits D-19 and 20 pertain to Edward Gilbert, who saw Gibson driving a blue Ford Thunderbird bought with the robbery money. *Id.* at 24-25. As noted above, Gilbert also testified that Gibson gave him two firearms: Gibson's and the victim's. *Id.* Both D-19 and D-20 are police reports regarding Gilbert's possible involvement in the Turner Rogers case. *Id.* at 26.

Exhibit D-21 is a Bucks County detective's report relating to the subpoena of Herman Carroll. *Id.* at 28-29. Carroll, a career criminal with a record dating to the 1970s, testified that Gibson made various inculpatory statements. *Id.* (quoting N.T. Trial, 3/9/95, at 369-75). The report states Carroll was reluctant to testify at trial against Gibson, and the detective told Carroll to contact the district attorney to arrange plea negotiations. *Id.*

Exhibits D-22 and 23 concern Bernard McLean, who testified that Gibson was driving a blue Thunderbird, said the police were looking for him, and admitted that he murdered a "white guy" for money. *Id.* at 30 (quoting N.T. Trial, 3/9/95, at 229-37). Exhibit D-22 is a report from the Turner Rogers case noting that McLean gave police a false name. Exhibit D-23 post-dates Gibson's trial, and is another Bristol Township Police report in which McLean denied previous statements he made to police. *Id.*

The Commonwealth moved to dismiss Gibson's PCRA petition as time-barred. The PCRA court limited the hearing's scope to whether Gibson could meet one of the exceptions to the PCRA's time bar. After two days of hearings, and after receiving briefs from the parties, the PCRA court found Gibson's PCRA petition time-barred, and dismissed it for lack of jurisdiction. This appeal followed.

On appeal, Gibson raises five issues:

1. Was [Gibson] denied his right to due process of law by the Commonwealth's introduction of false testimony and its failure to disclose **Brady** material because of suppression [of] individual pieces of evidence and [the] cumulative effect of the suppression of evidence?

2. Did the combination of counsel's ineffectiveness and the Commonwealth's due process violations prejudice [Gibson]?

3. Was Gibson's [second PCRA petition] timely filed pursuant to 42 Pa.C.S. § 9545(b)(1)(i) and (ii) and because [Gibson] showed a *prima facie* case of miscarriage of justice?

4. Did the [PCRA court] err in not granting [Gibson] discovery?

5. Did the [PCRA court] err in denying the claims in the [second PCRA petition] without a full hearing?

- 13 -

Appellant's Brief at 2 (some up-style capitalization removed).

We must address Gibson's third issue (the timeliness of the second PCRA petition) first. Timeliness is jurisdictional, and cannot be disregarded to reach the merits of a PCRA petition. *Commonwealth v. Taylor*, 67 A.3d 1245, 1248 (Pa. 2013); *Commonwealth v. Abu-Jamal*, 941 A.2d 1263, 1267-68 (Pa. 2008) ("The PCRA's timeliness requirements are jurisdictional in nature and must be strictly construed; courts may not address the merits of the issues raised in a petition if it is not timely filed."). "Questions regarding the scope of the statutory exceptions to the PCRA's jurisdictional time-bar raise questions of law; accordingly, our standard of review is *de novo*." *Commonwealth v. Fahy*, 959 A.2d 312, 315 (Pa. 2008); *accord Commonwealth v. Callahan*, 101 A.3d 118, 121 (Pa. Super. 2014).

A PCRA petitioner must file any PCRA petition "within one year of the date the judgment [became] final." 42 Pa.C.S.A. § 9545(b)(1). "[A] judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." *Id.* § 9545(b)(3). Three narrow exceptions exist, including claims frustrated by governmental interference and claims based on previously unknown facts. *Id.* § 9545(b)(1)(i) and (ii). Any petitioner invoking one of the exceptions must file a PCRA petition within 60 days of the date on which the claim could have been brought. *Id.* § 9545(b)(2). "[I]t is the appellant's burden to allege and prove that one of the timeliness exceptions

applies." ***Commonwealth v. Edmonson***, 65 A.3d 549, 560 (Pa. 2013) (internal citation omitted).

In this case, Gibson's judgment of sentence became final on the date the Supreme Court of the United States denied his *certiorari* petition, October 4, 1999.[7]  Gibson concedes the untimeliness of his second PCRA petition, which he filed more than ten years later.  Gibson nevertheless claims he meets the governmental interference and previously unknown facts exceptions to the PCRA's time bar.  He claims the Commonwealth's discovery disclosure in the federal *habeas* case allows him to invoke those exceptions.  As such, Gibson notes that he filed the current PCRA petition within 60 days of receiving those documents.

Gibson spends the vast majority of his brief discussing the merits of his ***Brady*** claims.

> But the law is clear that neither of the statutory exceptions to the timeliness requirement can begin with a discussion of the merits of a ***Brady*** claim; rather, [Gibson] must begin with a discussion of why the instant petition was timely filed.  As [our Supreme] Court has explained, the latter inquiry is separate and distinct from the former.  ***See Abu–Jamal***, [941 A.2d] at 1268

---

[7] The vacation of Gibson's death sentence does not restart the PCRA clock for his claims, none of which concerns his resentencing to life in prison.  ***Cf. Commonwealth v. Lesko***, 15 A.3d 345 (Pa. 2011) (holding PCRA petitioner's right to file "new" first PCRA extended only to the portion of his judgment disturbed by a federal *habeas* court, *i.e.*, his resentencing to life, and not any guilt-phase claims).  Even if the clock were restarted, Gibson filed his second PCRA petition years after our Supreme Court vacated his death sentence in ***Gibson II***, *i.e.*, outside of the 60-day window.

(noting that the merits of an underlying ***Brady*** claim [are] not relevant to resolving a timeliness issue under either § 9454(b)(1)(i) or (ii)).

***Commonwealth v. Stokes***, 959 A.2d 306, 310 (Pa. 2008).

Gibson confuses the merits of a ***Brady*** claim with the PCRA's jurisdictional prerequisites. A ***Brady*** violation—on the merits—requires proof that (1) the prosecutor suppressed evidence; (2) the evidence is helpful and exculpatory or impeaching; and (3) the suppression of evidence prejudiced the defendant. ***Commonwealth v. Reid***, 99 A.3d 470, 496 (Pa. 2014). In addition, "[t]o obtain a new trial based on the Commonwealth's failure to disclose evidence affecting a witness's credibility, a defendant must demonstrate that the reliability of the witness may be determinative of the defendant's guilt or innocence." ***Id.***

The previously unknown facts "exception does not contain the same requirements as a ***Brady*** claim . . . ." ***Abu-Jamal***, 941 A.2d at 1268. Nor does the governmental interference exception. ***See Commonwealth v. Hawkins***, 953 A.2d 1248, 1253 (Pa. 2008) (Opinion Announcing the Judgment of the Court (OAJC)). In contrast to the merits of a ***Brady*** claim, the previously unknown facts exception requires a PCRA petitioner to plead and prove he could not have discovered those facts earlier through the exercise of due diligence. ***Commonwealth v. Edmiston***, 65 A.3d 339, 345 (Pa. 2013). Similarly, "[a]lthough a ***Brady*** violation may fall within the governmental interference exception, the petitioner must plead and prove that the failure to previously raise these claims was the result of interference

by government officials, and that the information could not have been obtained earlier with the exercise of due diligence." *Hawkins*, 953 A.2d at 1253 (OAJC); *see also Edmiston*, 65 A.3d at 345.

Both exceptions therefore require Gibson to show he exercised due diligence in trying to uncover the alleged *Brady* material. *Stokes*, 959 A.2d at 309-10. "Due diligence demands that the petitioner take reasonable steps to protect his own interests." *Commonwealth v. Monaco*, 996 A.2d 1076, 1080 (Pa. Super. 2010) (internal citations omitted). A PCRA petitioner must show why he could not have presented the claim earlier with the exercise of due diligence. *See id.*

Upon review, we agree with the PCRA court that Gibson cannot meet the exceptions to the PCRA's time bar. The alleged *Brady* material does not qualify for either exception, and Gibson has failed to show that he exercised due diligence to uncover the evidence. Many of the documents have been public record since 1995. Several others were entered as exhibits at the hearing on Gibson's first PCRA petition in 2001. All of those documents were discoverable for more than 60 days before Gibson filed his second PCRA petition.

First, the documents contained in the Turner Rogers and Cyril "Moo Moo" Thomas court files (Exhibits D-14 to 17, 19, 20, and 22) were matters

of public record.[8]  Therefore, they cannot qualify as previously unknown facts.  Information in the public record is not "unknown" under 42 Pa.C.S.A. § 9454(b)(1)(ii).[9]  **Taylor**, 67 A.3d at 1248-49 (holding that trial counsel's alleged conflict of interest was not unknown where the predicate information had been in the file of the clerk of courts for over 15 years).  Moreover, those documents cannot qualify for the governmental interference exception.  We are unable to conceive how the Commonwealth could have interfered with Gibson's access to documents in the public record.  At any rate, Gibson has offered no evidence that the Commonwealth did so.

Similarly, we agree with the PCRA court that Gibson cannot invoke the timeliness exceptions based on documents (Exhibits D-10 and 13 to 17) he possessed as early as 2001.  At the PCRA hearing, Gibson's investigator admitted she saw those documents in 2001.  N.T. PCRA Hearing, 1/4/13, at 116-17.  As Gibson was aware of those documents' existence in 2001, his second PCRA petition is untimely even under the exceptions to the time bar.  42 Pa.C.S.A. § 9545(b)(2) (requiring PCRA petitions invoking an exception to be filed "within 60 days of the date the claim could have been presented").  Gibson could have raised claims related to those documents

---

[8] One of Gibson's trial counsel, John J. Fioravanti, Jr., Esq., also represented Turner Rogers in 1995.  **See** N.T. PCRA Hearing, 1/4/13, at 130-32.

[9] Also, a **Brady** claim fails on the merits if the alleged **Brady** material is equally accessible to the defense, which certainly applies to matters of public record.  **See Commonwealth v. Weiss**, 81 A.3d 767, 783 (Pa. 2013).

- 18 -

over a decade ago, when he actually received those documents.  *Cf. Stokes*, 959 A.2d at 311-12 (holding PCRA petition was untimely when petitioner was aware of facts underlying claim but waited several years to request files forming basis of his *Brady* claim).

Gibson fails to show the time bar exceptions apply to the remaining documents (Exhibits D-5 to D-9, D-11, D-12, D-19, D-20, and D-22).  He has not established that the Commonwealth interfered with his access to those documents—a necessary prerequisite to invoke the governmental-interference exception.  Indeed, there is no evidence that the Commonwealth was even aware of these documents, which were in the possession of the Bristol Township Police Department, and some of which involved police contact with witnesses or potential witnesses not resulting in an arrest or conviction.  Gibson baldly claims the Commonwealth hid the documents from him when the trial prosecutor allegedly claimed in 2001 that no other *Brady* material existed.[10]  Hiding requires knowledge that the

---

[10] Gibson offers another misleading quotation in support:

> At the initial PCRA hearing [in 2001], [Gibson] requested any additional <u>Brady</u> material and discovery from the Commonwealth.  In response, **the Commonwealth claimed "no such thing exists**."

Appellant's Brief at 10; Reply Brief at 3 (emphasis added).  In context, it is clear that the prosecutor merely stated his belief that all potential *Brady* material had been turned over at that time.  Gibson's quotation of the Commonwealth is actually is from his own counsel:

*(Footnote Continued Next Page)*

thing to be hidden exists.  Gibson did not show governmental interference regarding the alleged *Brady* material, which was in the possession of a police department not involved with Gibson's prosecution.   As the Commonwealth notes, Gibson offers no authority to support his proposition that a district attorney's office must actively scour the police records of every department within its jurisdiction to uncover **any** reports of police contact between **potential** witnesses even where the police contact resulted in neither arrest nor conviction.   Additionally, Gibson cannot meet the previously unknown facts exception.  For both timeliness exceptions, Gibson had the burden to show due diligence in uncovering such information. Having failed to show that he did so, Gibson cannot invoke the timeliness exceptions.

Citing ***Commonwealth v. Johnson***, 64 A.3d 621 (Pa. 2013) (*per curiam*), Gibson argues that our Supreme Court has held that information

_(Footnote Continued)_ _____

MR. ANDERSON[, *i.e.*, formerly PCRA counsel]: Similarly, Your Honor, petitioner requests any other notes, handwritten materials, memoranda regarding any statements of witnesses or potential witnesses in this case that weren't turned over.

Mr. Fritsch [*i.e.*, the prosecutor, and now a judge on the Court of Common Pleas of Bucks County] indicated, I believe that there are—**no such thing exists**.

MR. FRITSCH: No, Your Honor.  I believe everything has been turned over in the case, which certainly by way of witness— eyewitness statements and so forth and reports.

N.T. First PCRA Hearing, 4/27/01, at 6 (emphasis added).

discovered during federal *habeas* proceedings constitutes previously unknown facts and therefore qualifies for the PCRA's time-bar exception. But **Johnson** is a summary *per curiam* order—not a merits opinion. The Supreme "Court has made it clear that *per curiam* orders have no *stare decisis* effect." **Commonwealth v. Thompson**, 985 A.2d 928, 937 (Pa. 2009). Thus, **Johnson** is not binding. Moreover, because of its summary nature, we find no persuasive value in the **Johnson** order.

Gibson also argues courts may consider untimely PCRA petitions if the petitioner shows *prima facie* that a "miscarriage of justice" may have occurred. This argument is frivolous. **Lawson** and **Morales**, cited by Gibson, have nothing to do with the PCRA's time limits. The post-conviction petitions in those cases predate the 1995 amendment to the PCRA that added the jurisdictional time bar. **Commonwealth v. Morales**, 701 A.2d 516, 519 (Pa. 1997) ("On November 15, 1994, petitioner filed his second [PCRA] petition[.]"); **Commonwealth v. Lawson**, 549 A.2d 107, 109-110 (Pa. 1988) (noting the appellant's petition was filed in "March of 1982"). Gibson fails to acknowledge that—for 15 years—Pennsylvania appellate courts have repeatedly and unanimously held the PCRA's time limits are mandatory and jurisdictional. **See, e.g., Edmiston**, 65 A.3d at 346 ("The time requirements established by the PCRA are jurisdictional in nature; consequently, Pennsylvania courts may not entertain untimely PCRA petitions."); **Commonwealth v. Robinson**, 837 A.2d 1157, 1161 (Pa. 2003) ("This Court has repeatedly stated that the PCRA timeliness

requirements are jurisdictional in nature and, accordingly, a PCRA court cannot hear untimely PCRA petitions."); **Commonwealth v. Banks**, 726 A.2d 374, 376 (Pa. 1999) (clarifying that the PCRA's jurisdictional time limits are mandatory in all cases); **Commonwealth v. Lawson**, 90 A.3d 1, 4 (Pa. Super. 2014) ("The timeliness of a PCRA petition is a jurisdictional threshold and may not be disregarded in order to reach the merits of the claims raised in a PCRA petition that is untimely."); **see also Whitney v. Horn**, 280 F.3d 240, 251 (3d Cir. 2002) ("It is now clear that this one-year limitation is a jurisdictional rule that precludes consideration of the merits of any untimely PCRA petition . . . .").

In sum, the PCRA court correctly concluded that Gibson's second PCRA petition is untimely, because he failed to show that an exception to the PCRA's time bar applies. Therefore, the PCRA court lacked jurisdiction to adjudicate the merits of Gibson's petition. Moreover, because the PCRA court lacked jurisdiction, it had no authority to grant Gibson's request for discovery, or to hold a full hearing on the merits. Given our conclusion that the PCRA court lacked jurisdiction, we do not need to address Gibson's remaining issues.[11] **See Taylor**, 67 A.3d at 1249 ("As the PCRA court

_____

[11] Because we do not reach the merits, we do not need to address whether Gibson's **Brady** claims are waived or previously litigated, **see** 42 Pa.C.S.A. § 9543(a)(3), or whether Gibson met the miscarriage of justice standard that applies to second or subsequent PCRA petitions, **see Lawson**, 549 A.2d at 112.

properly found the petition was untimely, we do not reach, and will not address, the merits.").

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/16/2015