**[J-108-2014] [MO: Eakin, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 693 CAP |
| | : |
| Appellant | : Appeal from the Order entered on |
| | : 01/10/2014 in the Court of Common Pleas, |
| | : Criminal Division of Philadelphia County at |
| v. | : No. CP-51-CR-0632821-1991 |
| | : |
| | : SUBMITTED:   October 27, 2014 |
| EDWARD BRACEY, | : |
| | : |
| Appellee | : |

**DISSENTING OPINION**

**MR. JUSTICE STEVENS**                    **DECIDED:   June 16, 2015**

In my view, Appellee has failed to prove by a preponderance of the evidence that he suffers from an intellectual disability as this Court defined that term in Commonwealth v. Miller, 585 Pa. 144, 888 A.2d 624 (2005)[1] and the PCRA court abused its discretion in finding to the contrary.   I would reverse the PCRA court's order vacating Appellee's original sentence of death; therefore, I respectfully dissent.

In Atkins v. Virginia, 536 U.S. 304, 318, 122 S.Ct. 2242, 2250 (2002) (emphasis added), our Supreme Court stated that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that

---

[1] As did the Majority, in light of Hall v. Florida, 134 S.Ct. 1986 (2014), I have replaced the designation "mental retardation" with "intellectual disability" herein, except where I directly quote from a decision published before the new term was adopted in Hall.

became manifest before age 18."  In considering the impact of the then recent Atkins decision in Miller, this Court refused to adopt a cutoff IQ score for determining whether one is intellectually disabled and instead found such a designation flows from "the interaction between limited intellectual functioning and deficiencies in adaptive skills that establish mental retardation."  Miller, at 155, 888 A.2d at 631.

When considering Appellee's appeal from the PCRA court's order denying his first petition for relief under the PCRA, this Court considered, inter alia, Appellee's argument that trial counsel had been ineffective for failing to investigate thoroughly whether or not Appellee was either organically brain damaged or mentally ill and to present evidence to this effect at his penalty phase hearing.  Commonwealth v. Bracey (Bracey II), 568 Pa. 264, 795 A.2d 935 (2001), reconsideration denied, April 18, 2002.

Appellee presented expert testimony at his first PCRA evidentiary hearing in 1998 from three mental health professionals, Drs. Carol Armstrong, Neil Blumberg and Barry Krop, whom we stated essentially had concluded he suffered from "long-standing organic brain damage" following their examinations of him which did not occur until over five and six years after the shooting.  This Court found that such diagnoses were negated by the mental health evaluation conducted on September 15, 1991, by Dr. Arthur Boxer, a board-certified psychiatrist whom defense counsel had hired to evaluate Appellee for the purpose of determining whether there were any viable psychiatric defenses that he could advance at trial or any mental health mitigation evidence that he could present to the jury at the penalty phase.  We stressed that Dr. Boxer previously had performed several hundred psychiatric evaluations in criminal cases and that he

conducted his examination of Appellee less than one year after he committed the crime and prior to the commencement of trial. Bracey II, at 277, 795 A.2d at 942.

In a follow-up letter to trial counsel, Dr. Boxer revealed he would not offer any helpful testimony to establish any type of mental health mitigation evidence at the penalty phase hearing. In fact, Dr. Boxer remarked at the PCRA evidentiary hearing that Appellee had been responsive and articulate during his evaluation and exhibited no signs of suffering from organic brain damage or any major mental illness. Bracey II, at 278, 795 A.2d at 942. This Court noted Dr. Boxer's analysis was in line with prior, court-ordered mental health evaluations of Appellee by Dr. Edwin Camiel and Philadelphia court psychologist Lawrence Byrne conducted in the early 1980's and for the instant case, none of which suggested Appellee was brain damaged or mentally ill, but instead determined Appellee did not manifest any major mental illness which would interfere with the trial court's ability to sentence him to death. Bracey II, at 278, 795 A.2d at 943. Similarly, a board-certified neurologist Dr. Thomas Sacchetti testified for the Commonwealth at the PCRA evidentiary hearing that Appellee did not suffer from organic brain disease. Bracey II, at 279 n 8, 795 A.2d at 943 n 8.

Appellee further averred the PCRA court should have determined trial counsel had been ineffective for failing to request a hearing to determine whether he was competent to stand trial in light of testimony elicited at the PCRA hearing from family members that he always had been "slow" and the opinions of Drs. Armstrong, Blumberg and Krop. Bracey II, at 282-283, 795 A.2d at 945. In finding this claim failed, this Court again highlighted the testimony of Dr. Boxer which we felt substantiated trial counsel's own belief Appellee was competent to stand trial. Dr. Boxer testified his evaluation of

Appellee revealed an individual who was able to respond effectively to his queries and did not display any behavior which would suggest he suffered from any psychiatric problems. As stated previously, Dr. Boxer further found Appellee did not suffer from any organic brain disease or any other serious mental illness. Bracey II, at 283, 795 A.2d at 946. While Dr. Boxer opined Appellee suffered from an antisocial personality disorder, this Court relied upon Commonwealth v. Zettlemoyer, 500 Pa. 16, 454 A.2d 937 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) for the proposition that such disorder does not demonstrate an accused's diminished capacity, which can be established only where an accused can prove that at the time of the killing a mental disorder affected his ability to form a specific intent to kill. Id. In addition, as the Majority notes herein and the Commonwealth relays in its brief, the record is replete with statements made by Appellee's own expert witnesses, Drs. Krop, Armstrong, and Camiel, at the first PCRA evidentiary hearing acknowledging that although Appellee's intellectual functioning was below average, he was not intellectually disabled. Majority Opinion, at 20.

Yet, Dr. Daniel Martell, who did conduct some interviews, largely relied upon his review of Appellee's school, medical and prison records, interviews, and the notes of testimony from the 1998 evidentiary hearing when finding him intellectually deficient at 2013 evidentiary hearing. Moreover, Dr. Barry Crown, who administered Appellee's 2011 WAIS-IV test which rendered his significantly lowest IQ score, did not personally interview anyone before rendering his opinion Appellee had an intellectual disability, though he admitted he had informed Appellee his counsel had requested his presence. In addition, the three lay witnesses who testified at the 2013 evidentiary hearing were

Appellee's sister, a family friend, and a fifth-grade teacher, the latter of whom admitted defense counsel had instructed him that Appellee's life would be spared were he found to suffer from intellectual disability and provided testimony that conflicted with notations he previously had made in Appellee's school records.

To the contrary, the evidence relied upon by the PCRA court in Miller included the testimony of all five experts who had testified during the appellee's penalty phase hearing and agreed that he was "borderline" or "mildly mentally retarded." These opinions were supported by school records that evinced the appellee had been placed in special education classes for the "educable retarded" in first grade and described him as functioning within the "borderline retarded range of intelligence." Miller, at 149, 888 A.2d at 627. Indeed, the Commonwealth's own witness therein repeatedly stated that the appellee functioned in the "borderline retarded" or "mentally retarded" range. Miller, at 158, 888 A.2d at 632.

Nevertheless in finding Appellee's experts herein did not present self-contradicting testimony at the evidentiary hearing in 2013, the Majority relies upon Miller and stresses the evidentiary hearing held in 1998 did not center around a determination of whether Appellee had an intellectual disability but rather concerned his ineffective assistance of counsel claims based upon assertions of brain damage and mental illness. Majority Opinion, at 27-28 see also Miller, supra, (stating expert testimony which occurred in the context of a defendant's attempt to show organic brain damage, not intellectual disability, was not sufficient to establish an Atkins claim and the appellant was entitled to a hearing on the same).

While I recognize the expert findings discussed in Bracey II were garnered in the context of Appellee's ineffectiveness claims and a determination of intellectual disability stems from considerations which differ to a degree from those analyzed when determining the existence of organic brain damage or mental illness, I cannot credit the opinions of mental health professionals who previously posited Appellee did not have an intellectual disability yet later so diagnosed him in response to his filing of a second PCRA petition in 2013 seeking Atkins relief. See Commonwealth v. Hackett, ___ Pa. ____, ____, 99 A.3d 11, 33 (2014) (citation omitted) (stating "[a]s there may be a powerful incentive to malinger and to slant evidence in cases where a petitioner has not been clinically diagnosed with intellectual disability and the record before the factfinder was created to seek relief under Atkins, this Court has found a petitioner's motivation to slant evidence of intellectual disability is a relevant consideration for Atkins factfinders in assessing not only the validity of results of post-Atkins intelligence testing, but in analyzing the entire Atkins petition.").[2] This is especially so in light of the fact that the mental health experts who examined Appellee prior to trial would have been motivated to determine not only whether he suffered from a mental illness and/or organic brain damage but also to discern whether he had an intellectual disability, as his possible

---

[2] See also, Commonwealth v. Birdsong, 611 Pa. 203, ____ n 3, 24 A.3d 319, 352 n 3 (2011) (Castille, C.J., concurring) (stating "[m]any courts, including this one, have recognized that Atkins claims are particularly susceptible to, and invite, manipulation. Justice Scalia noted the problem in his dissent in Atkins: "One need only read the definitions of mental retardation adopted by the American Association on Mental Retardation and the American Psychiatric Association ... to realize that that the symptoms of this condition can readily be feigned. And whereas the capital defendant who feigns insanity risks commitment to a mental institution until he can be cured (and then tried and executed), the capital defendant who feigns mental retardation risks nothing at all." 536 U.S. at 353, 122 S.Ct. 2242 (Scalia, J., joined by Rehnquist, C.J. and Thomas, J., dissenting) (citations omitted)").

conviction for first-degree murder and sentence of death were at stake; thus, in the extant case I believe Appellee's intellectual capabilities were subjected to an in-depth analysis prior to trial and the evaluations of Appellee conducted in 1998 were fifteen years closer in time and, therefore, more reflective of Appellee's intellectual abilities at the time of his crime than when they were rehashed in the PCRA evidentiary hearing in April of 2013.

The Federal Defender has a history of raising Atkins issues in serial PCRA petitions which oftentimes results in a creation of significant delays in capital appeals. Birdsong, at ____, 24 A.3d at 351 (Castille, C.J., concurring).[3]  Certainly, such delays are justified and, indeed, necessary where the petition raises a meritorious claim; however, in my view, the instant matter does not do so.  While the Majority highlights Appellee's low test scores in school, difficulty playing age-appropriate games and socially relating to his peers as a child, trouble performing some simple tasks, and poor sense of direction in his neighborhood as support for the PCRA court's finding of intellectual disability, the factual accounts of his crime as set forth in our opinions on both direct appeal and in Bracey II evince otherwise.  It is important to remember that when Appellee murdered Officer Boyle on February 4, 1991, he possessed the intellectual capacity to:  arm himself in preparation of robbing and shooting some drug dealers; operate a stolen vehicle; brandish a 9 mm automatic handgun at Officer Boyle while standing on the hood and roof of the police cruiser; demand that the Officer not touch his own firearm; shoot Officer Boyle with no less than eight rounds, one of which struck him in

---

[3] It should be noted that in Birdsong, the appellee's primary counsel was the same Federal Defender primarily representing Appellee herein, and he also raised a claim that the appellant was not eligible for execution under Atkins due to his intellectual disability. In addition, Drs. Crown, Martell and Armstrong testified for the defense at the Atkins hearing held in the Hackett case.

the right temple; and evade police for several days. Such premeditative behavior indicates an individual who was more than capable of taking control of a deadly situation. As this Court noted on direct appeal, this violent incident was not Appellee's first, for the jury determined he had a significant history of felony convictions involving the use or threat of violence to others including two prior burglary convictions. Commonwealth v. Bracey, 541 Pa. 322, 349 n 15, 622 A.2d 1062, 1076 n 15 (1995).

Appellee fully litigated his direct appeal and first PCRA wherein his mental functioning was studied by numerous experts; yet, the intellectual disability with which he was diagnosed post Atkins was not detected by anyone prior thereto. In light of the often contradictory record evidence, which at best indicates appellee was a below average student and may have struggled with his dexterity and with interpersonal relationships, I simply cannot find he has proven by a preponderance of the evidence that he suffers from a significantly subaverage intellectual functioning or from significant adaptive deficits the onset of which occurred before he turned eighteen which would entitle to him to Atkins relief.

Accordingly, I would vacate the PCRA court's decision and accompanying order of January 10, 2014, which found Appellee to be intellectually disabled and exempt from the death penalty and remand to the trial court for reinstatement of the death sentence.